[Cite as *State v. Moiduddin*, 2019-Ohio-3544.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLANT,                        CASE NO. 14-18-15

    v.

MOHAMMED MOIDUDDIN,                   O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Union County Common Pleas Court
Trial Court No. 2017 CR 0238

**Judgment Reversed and Cause Remanded**

**Date of Decision: September 3, 2019**

APPEARANCES:

    *Terry L. Hord* **for Appellant**

    *Gary D. Andorka* **for Appellee**

**PRESTON, J.**

**{¶1}** Plaintiff-appellant, the State of Ohio, appeals the July 18, 2018 judgment of the Union County Court of Common Pleas granting the motion to suppress evidence of defendant-appellee, Mohammed Moiduddin ("Moiduddin"), and dismissing the indictment against him. For the reasons that follow, we reverse.

**{¶2}** This case stems from a stop of an automobile on US 33 in Union County, Ohio. (Doc. No. 36). In the early morning hours of September 3, 2017, Trooper Dorian Byers ("Trooper Byers") of the Ohio State Highway Patrol observed a vehicle traveling eastbound on US 33 at a low rate of speed. (*Id.*); (Apr. 5, 2018 Tr. at 32). After pacing the vehicle at a slow speed for a period of time, Trooper Byers activated his overhead lights and effected a stop of the vehicle. (Doc. No. 36). On approaching the passenger side of the vehicle, Trooper Byers noticed that the driver, Moiduddin, displayed indicators of intoxication. (Apr. 5, 2018 Tr. at 30-31). Trooper Byers then asked Moiduddin to exit the vehicle and proceeded to subject him to field sobriety testing. (*Id.* at 31-33). Although a portable breath test failed to detect the presence of alcohol in Moiduddin's system, Moiduddin's performance on a number of the field sobriety tests administered by Trooper Byers was unsatisfactory, which prompted Trooper Byers to arrest him on suspicion of operating a vehicle under the influence of drugs. (*Id.* at 36-37); (Defendant's Ex. B). Thereafter, while inventorying the contents of Moiduddin's vehicle, Trooper

Byers discovered a small plastic bag filled with a white, powdery substance and a separate black bag with a label that read "Analytical Sample." (Apr. 5, 2018 Tr. at 39-40); (Defendant's Ex. B). Chemical analyses later revealed that the bags contained substances that are substantially structurally similar to 4-methoxymethamphetamine and phencyclidine. (State's Ex. 1).

{¶3} On October 30, 2017, the Union County Grand Jury indicted Moiduddin on three counts: Count One of operating a vehicle under the influence of a drug of abuse in violation of R.C. 4511.19(A)(1)(a), (G)(1)(a), a first-degree misdemeanor, and Counts Two and Three of aggravated possession of drugs in violation of R.C. 2925.11(A), (C)(1)(a), fifth-degree felonies. (Doc. No. 1). On November 29, 2017, Moiduddin appeared for arraignment and pleaded not guilty to the counts of the indictment. (Doc. No. 7).

{¶4} On January 31, 2018, Moiduddin filed a motion to suppress evidence. (Doc. No. 18). In support of his motion, Moiduddin argued that his rights under the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution were violated when Trooper Byers stopped his vehicle. (*Id.*). In particular, Moiduddin contended that Trooper Byers did not have probable cause or reasonable suspicion to stop his vehicle for a violation of R.C. 4511.22, Ohio's slow-speed statute. (*Id.*).

{¶5} A hearing on Moiduddin's motion to suppress was held on April 5, 2018. (*See* Apr. 5, 2018 Tr. at 1). On April 12, 2018, Moiduddin filed his post-suppression-hearing brief. (Doc. No. 31). On April 20, 2018, the State filed its response to Moiduddin's post-suppression-hearing brief. (Doc. No. 34). That same day, the State filed an amended response to Moiduddin's post-suppression-hearing brief. (Doc. No. 35).

{¶6} On July 18, 2018, the trial court granted Moiduddin's motion to suppress evidence. (Doc. No. 36). Specifically, the trial court concluded that Trooper Byers did not have probable cause or reasonable suspicion to stop Moiduddin for a violation of R.C. 4511.22. (*Id.*). The trial court also concluded that the stop of Moiduddin's vehicle was not permissible under the community caretaking exception to the Fourth Amendment's warrant requirement. (*Id.*). Finally, after granting Moiduddin's suppression motion, the trial court also dismissed the indictment. (*Id.*).

{¶7} On August 17, 2018, the State filed a notice of appeal. (Doc. No. 37). It raises one assignment of error for our review.

**Assignment of Error**

**The trial court failed to apply the law of community-caretaking/emergency-aid function to the facts that exist in the hearing on the motion to suppress evidence and then based on the suppression of the evidence the trial court sua sponte dismissed the case in its entirety.**

{¶8} In its assignment of error, the State argues that the trial court erred by granting Moiduddin's motion to suppress evidence. It further argues that the trial court erred by sua sponte dismissing the indictment against Moiduddin. With respect to the trial court's grant of Moiduddin's motion to suppress evidence, the State notes that Trooper Byers was reasonably concerned for Moiduddin's well-being because of the unusually slow speed at which Moiduddin was operating his vehicle. Specifically, the State asserts that Trooper Byers was concerned that Moiduddin's vehicle may have been mechanically impaired or that Moiduddin was suffering from a "medical episode." (Appellant's Brief at 11). Furthermore, the State notes that Trooper Byers was also concerned that Moiduddin and other motorists on the highway were imperiled by the presence of Moiduddin's slow-moving vehicle in fast-moving traffic. (*Id.* at 11-14). The State argues that, given these concerns, Trooper Byers's stop of Moiduddin's vehicle was constitutionally valid because Trooper Byers was exercising a "community caretaking" function when he stopped Moiduddin's vehicle. (*Id.* at 10-15). Regarding its contention that the trial court erred by sua sponte dismissing the indictment, the State argues that because the dismissal was apparently based on the trial court's supposedly erroneous decision to grant Moiduddin's motion to suppress, its decision to dismiss the indictment was also erroneous. (*Id.* at 5-6). We turn first to the State's argument that the trial court erred by granting Moiduddin's motion to suppress, followed by

the State's argument that the trial court erred by sua sponte dismissing the indictment.

{¶9} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶10} The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment to the United States Constitution, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Furthermore, Article I, Section 14 of the Ohio Constitution provides:

The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized.

"Historically, the protections afforded by Article I, Section 14 of the Ohio Constitution have been construed as coextensive with the protections of the Fourth Amendment of the United States Constitution," with limited exceptions. *State v. Box*, 10th Dist. Franklin No. 16AP-371, 2017-Ohio-1138, ¶ 17, citing *State v. Geraldo*, 68 Ohio St.2d 120, 125-126 (1981), *State v. Robinette*, 80 Ohio St.3d 234, 239 (1997), and *State v. Jones*, 88 Ohio St.3d 430, 434 (2000). *See, e.g.*, *State v. Brown*, 143 Ohio St.3d 444, 2015-Ohio-2438, ¶ 23 ("Article I, Section 14 of the Ohio Constitution affords greater protection than the Fourth Amendment against searches and seizures conducted by members of law enforcement who lack authority to make an arrest."). "'The primary purpose of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers in order to "safeguard the privacy and security of individuals against

arbitrary [governmental] invasions.”’”” *State v. Kerr*, 3d Dist. Allen No. 1-17-01, 2017-Ohio-8516, ¶ 12, quoting *State v. Carlson*, 102 Ohio App.3d 585, 592 (9th Dist.1995), quoting *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391 (1979). “‘The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.’” *Id.*, quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801 (1991), citing *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793 (1990). “Thus, ‘[t]he touchstone of the Fourth Amendment is reasonableness.’” *Id*., quoting *Jimeno* at 250.

{¶11} In this case, Trooper Byers's stop of Moiduddin's vehicle potentially implicates the Fourth Amendment's protections against unreasonable searches and seizures. “Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a ‘seizure’ of ‘persons’ within the meaning” of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769 (1996), citing *Prouse* at 653, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074 (1976), and *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574 (1975). Accordingly, “[a]n automobile stop is * * * subject to the constitutional imperative that it not be ‘unreasonable’ under the circumstances.” *Id.* at 810. While probable cause to believe that a motorist has committed a crime is a “complete justification for a traffic stop,” a traffic stop need not be supported by probable cause to satisfy

the Fourth Amendment's reasonableness requirement. *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 23. Rather, a traffic stop is reasonable, and thus constitutionally permissible, if a law enforcement officer has "a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime," including a traffic violation. *Id.* at ¶ 7, citing *Prouse* at 663 and *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138 (1984), quoting *Brignoni-Ponce* at 881; *State v. Smith*, 10th Dist. Franklin No. 13AP-592, 2014-Ohio-712, ¶ 10.

{¶12} "The Supreme Court of Ohio has defined 'reasonable articulable suspicion' as 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion [upon an individual's freedom of movement].'" *State v. Smith*, 3d Dist. Marion No. 9-17-05, 2017-Ohio-5845, ¶ 9, quoting *State v. Bobo*, 37 Ohio St.3d 177, 178 (1988), quoting *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868 (1968). "'Reasonable suspicion entails some minimal level of objective justification for making a stop—that is, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.'" *Kerr* at ¶ 15, quoting *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, ¶ 13 (2d Dist.), quoting *State v. Jones*, 70 Ohio App.3d 554, 556-557 (2d Dist.1990), citing *Terry* at 27. "'The "reasonable and articulable suspicion" analysis is based on the *collection* of factors, not on the

individual factors themselves.'" (Emphasis sic.) *Smith*, 2017-Ohio-5845, at ¶ 9, quoting *Mays* at ¶ 12, quoting *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 19. "'[T]hese circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.'" *Kerr* at ¶ 16, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991), citing *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976) and *State v. Freeman*, 64 Ohio St.2d 291, 295 (1980).

{¶13} With respect to the circumstances surrounding Trooper Byers's stop of Moiduddin's vehicle, the trial court made the following findings of fact:

At 4:09 a.m. on the morning of September 3, 2017, Trooper Byers was on stationary patrol on US 33 near milepost 18 facing eastbound traffic when he observed [Moiduddin's] vehicle travelling at a speed which he estimated to be 45 mph. Trooper Byers asked Trooper Austin to clock the vehicle and Trooper Austin clocked the vehicle by laser at 35 mph. The speed limit in that area was 70 mph. There was no posted slow speed limit. Trooper Byers pulled out and fell in behind the vehicle for a pace clock of the vehicle. He testified that he did not recall the vehicle's speed as a result of the pace clock. The vehicle was traveling in the right hand (slow) lane and the vehicle never strayed from its marked lane * * *. The vehicle's slow speed

caused Trooper Byers to activate his lights. Trooper Byers testified that when he activated his lights, the vehicle pulled over immediately. The trooper observed the traffic in the area to be light. There was no testimony that [Moiduddin's] vehicle was blocking or impeding the flow of any traffic.

(Doc. No. 36). In addition, the trial court found that "there was no showing that [Moiduddin] committed any other traffic infraction * * *." (*Id.*). Competent, credible evidence supports the trial court's factual findings concerning Trooper Byers's stop of Moiduddin's vehicle. *See State v. Craw*, 3d Dist. Mercer No. 10-17-09, 2018-Ohio-1769, ¶ 36, citing *State v. Thompson*, 7th Dist. Jefferson Nos. 98 JE 28 and 98 JE 29, 2001 WL 69197, *5-6 (Jan. 24, 2001).

{¶14} At the April 5, 2018 suppression hearing, Trooper Byers testified that he was on patrol on September 3, 2017 at approximately 4:09 a.m. when a vehicle caught his attention because it "was traveling at an unusual[,] * * * low rate of speed." (Apr. 5, 2018 Tr. at 26-28). He stated that he visually estimated that the vehicle was traveling "close to about 45 miles per hour." (*Id.* at 27). Trooper Byers testified that because his view of the vehicle was obstructed, he asked a fellow trooper to use a laser speed gun to determine the speed of the vehicle. (*Id.*). Trooper Byers testified that the laser reading showed that the vehicle was actually moving at a speed of 35 miles per hour. (*Id.* at 27-28).

{¶15} Trooper Byers indicated that he was concerned about the vehicle because at "[t]hat time of day and at the 70 mile per hour zone, you hardly will ever see a vehicle traveling at that low rate of speed. And if they are, it could be a possible medical episode or somebody is having vehicle issues." (*Id.* at 28). He reiterated that he was "[a]bsolutely" concerned that the driver of the vehicle could have been suffering from a medical problem or that they were otherwise impaired. (*Id.* at 29). He also testified that the vehicle's slow speed caused him concern for the safety of other motorists and that he deemed the driving to be unsafe. (*Id.* at 29, 36).

{¶16} Trooper Byers testified that he pulled out of the "cross over" to catch up to the vehicle and "just paced him right there at about the same speed." (*Id.* at 28). Although he could not recall the speed at which the vehicle was traveling while he paced it, he did testify that the vehicle was moving "very slow." (*Id.* at 29). Trooper Byers testified that he eventually activated his blue emergency lights and effected a stop of the vehicle. (*Id.*). He identified Moiduddin as the driver of the slow-moving vehicle. (*Id.* at 31).

{¶17} On cross-examination, Trooper Byers initially testified that he believed that it was raining when he stopped Moiduddin's vehicle, but upon being presented with a copy of the traffic ticket he issued to Moiduddin, he acknowledged that the ticket stated that there were no adverse weather conditions at the time of the

stop. (*Id.* at 42, 44); (Defendant's Ex. A). He further testified that traffic was light on the morning of the stop, that the stop was executed in a rural area, that the highway featured two eastbound lanes, and that there was no posted minimum speed limit. (Apr. 5, 2018 Tr. at 44-45). Trooper Byers stated that there were no cars between Moiduddin's vehicle and his cruiser while he paced Moiduddin's vehicle and that, "[o]ther than a few cars that passed [him]" while he was pacing Moiduddin, there was no other traffic on US 33. (*Id.* at 45). According to Trooper Byers, Moiduddin was operating his vehicle in the right-hand lane, and he was neither impeding nor blocking traffic. (*Id.* at 45-46).

{¶18} Trooper Byers stated that as he paced Moiduddin's vehicle, he did not observe Moiduddin weave in his lane, commit any marked lane violations, or commit any traffic violation other than what Trooper Byers believed to be a slow-speed violation. (*Id.* at 45-46). He testified that the reason he stopped Moiduddin's vehicle was for a slow-speed infraction in violation of R.C. 4511.22. (*Id.* at 44). When questioned about his earlier statement that he was concerned that the driver of the vehicle could have been in the midst of a "medical episode," Trooper Byers conceded that his statement of facts summarizing the events of September 3, 2017 did not mention "any concern about [Moiduddin] possibly having a medical episode." (*Id.* at 52); (Defendant's Ex. B).

{¶19} Finally, on redirect-examination, Trooper Byers agreed with the State's proposition that "[i]f a car had come up fast behind this other vehicle driven by Mr. Moiduddin, and a car was going the registered speed of 70 miles per hour, and Mr. Moiduddin was going 35 miles per hour," there would "have been an unreasonable situation that [Trooper Byers] could have prevented." (Apr. 5, 2018 Tr. at 55).

{¶20} On these findings, the trial court first concluded that Trooper Byers did not have probable cause or reasonable suspicion to stop Moiduddin's vehicle for a violation of R.C. 4511.22(A):

Given the facts presented by the testimony of Trooper Byers, the fact that there was no evidence presented that any traffic was impeded or obstructed, and that there was no showing that [Moiduddin] committed any other traffic infraction, the State has failed to make a prima facie showing that [Moiduddin's] conduct violated the elements of O.R.C. 4511.22(A) on its face.[1] Because Trooper Byers failed to establish a prima facie violation of the statute, his suspicion of

---

[1] R.C. 4511.22(A) provides: "No person shall * * * operate a vehicle * * * at such an unreasonably slow speed as to impede or block the normal and reasonable movement of traffic, except when stopping or reduced speed is necessary for safe operation or to comply with law." Courts have generally interpreted the statute to require evidence of actual impediment or obstruction of traffic. *State v. Bahen*, 10th Dist. Franklin No. 16AP-65, 2016-Ohio-7012, ¶ 25-26; *State v. Dean*, 5th Dist. Licking No. 12-CA-60, 2013-Ohio-313, ¶ 14.

criminal activity was unreasonable. Accordingly, there was no basis for the investigative traffic stop.

(Doc. No. 36).

{¶21} The State concedes that Trooper Byers had neither probable cause nor reasonable suspicion to stop Moiduddin's vehicle for a violation of R.C. 4511.22.[2] (*See* Appellant's Brief at 10-11). Given that it is undisputed that Moiduddin was not operating his vehicle on a part of the highway with a posted minimum speed limit[3] and that Moiduddin's vehicle did not impede or obstruct traffic, we do not second-guess the State's concession. Instead, the State argues that the judgment of the trial court granting Moiduddin's suppression motion should be reversed because the trial court erred by concluding that the stop of Moiduddin's vehicle was not valid under the community caretaking exception.

{¶22} After concluding that the stop of Moiduddin's vehicle was not supported either by probable cause or by reasonable suspicion of a violation of R.C. 4511.22, the trial court proceeded to determine whether the "caretaker exception to the warrant requirement" supported Trooper Byers's stop of Moiduddin's vehicle.

---

[2] The State also conceded this point at the trial-court level. (*See* Doc. Nos. 34, 36).

[3] A driver may also violate R.C. 4511.22 by operating their vehicle at a speed which is less than a posted minimum speed limit: "Whenever the director of transportation or local authorities determine on the basis of an engineering and traffic investigation that slow speeds on any part of a controlled-access highway, expressway, or freeway consistently impede the normal and reasonable movement of traffic, the director or such local authority may declare a minimum speed limit below which no person shall operate a motor vehicle, trackless trolley, or street car except when necessary for safe operation or in compliance with law." R.C. 4511.22(B).

(Doc. No. 36). In its analysis, the trial court relied on *State v. Dunn*, a case in which the Supreme Court of Ohio held:

> The community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement allows a law-enforcement officer with objectively reasonable grounds to believe that there is an immediate need for his or her assistance to protect life or prevent serious injury to effect a community-caretaking/emergency-aid stop.

131 Ohio St.3d 325, 2012-Ohio-1008, ¶ 26. In concluding that the community caretaking exception did not supply a valid basis for Trooper Byers's stop of Moiduddin's vehicle, the trial court found that the "totality of the circumstances * * * d[id] not suggest that there was an immediate need for assistance to protect life or prevent serious injury." (Doc. No. 36). The trial court concluded that although Moiduddin "was driving at a very slow speed," "he did not violate O.R.C. 4511.22 and slow speed alone does not create a reasonable belief that there was an immediate need for assistance to prevent death or serious injury." (*Id.*).

{¶23} The State argues that the stop of Moiduddin's vehicle was permissible under the community caretaking exception because Trooper Byers was reasonably concerned that Moiduddin's vehicle was mechanically impaired or that Moiduddin was suffering from a "medical episode." (Appellant's Brief at 11-12). It further contends that the stop was a valid exercise of Trooper Byers's function as

community caretaker because "operating a vehicle at such slow speed presented concern for other motorists' safety on US 33" even though Moiduddin's driving did not amount to a violation of R.C. 4511.22. (*Id.* at 11-12). In response, Moiduddin, relying almost entirely on *Dunn*, argues that the trial court correctly determined that the community caretaking exception is not applicable to the facts of this case because "Trooper Byers did not have objectively reasonable grounds to believe that there was an immediate need for his assistance to protect life or prevent serious injury to justify the stop." (Appellee's Brief at 5). Moiduddin asserts that this case "involve[s] the stop of a vehicle by show of authority and is different from coming upon a vehicle that is already stopped to inquire whether there is a need of assistance." (*Id.*). Finally, Moiduddin submits that "[Trooper Byers's] conduct of pacing the vehicle for a significant amount of time is contrary to any belief of immediate need for assistance." (*Id.* at 6).

**{¶24}** Before evaluating the merits of the parties' arguments, we feel it necessary to review the origins of the community caretaking exception and the development of the doctrine. The Supreme Court of the United States first acknowledged the community caretaking exception in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523 (1973). In that case, Dombrowski was involved in a single-vehicle accident in rural Wisconsin. *Id.* at 435-436. At the scene of the accident, Dombrowski informed local police officers that he was a Chicago police officer. *Id.*

at 436. Believing that Chicago police officers were required by regulation to carry their service revolvers with them at all times, local police officers looked for Dombrowski's service weapon on his person. *Id.* Failing to find a weapon on Dombrowski's person, one of the local police officers looked into the front seat and glove compartment of Dombrowski's vehicle; however, the officer did not find a revolver. *Id.* Thereafter, local police officers had the disabled vehicle towed to a privately owned garage where it was left outside without a police guard. *Id.* After Dombrowski was formally arrested for drunken driving and taken to the hospital, one of the local police officers drove to the private garage to search for Dombrowski's revolver in the wrecked automobile. *Id.* at 436-437. During the search for Dombrowski's weapon, which was conducted without a warrant, the local police officer unlocked the trunk of the vehicle, where he discovered evidence linking Dombrowski to a murder—a crime for which he was eventually convicted. *Id.* at 437, 439.

{¶25} In upholding the constitutionality of the search of Dombrowski's vehicle, the court observed:

Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially

greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as *community caretaking functions*, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

(Emphasis added.) *Id.* at 441. The court concluded that the justification for the search of Dombrowski's vehicle, "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle," was "constitutionally reasonable." *Id.* at 447. Acknowledging its previous "recognition of the distinction between motor vehicles and dwelling places," the court held that "the type of caretaking 'search' conducted * * * of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained." *Id.* at 447-448.

{¶26} Since *Dombrowski*, "an overwhelming majority of lower federal courts and state courts have consistently described and applied the [community

caretaking] doctrine as an exception to the Fourth Amendment's warrant requirement." *State v. McCormick*, 494 S.W.3d 673, 682 (Tenn.2016), fn. 9 (collecting cases). *See Commonwealth v. Livingstone*, 644 Pa. 27, 58-60 (2017) (collecting cases). While many courts have limited application of the exception to its original context—searches (and occasionally seizures) of automobiles—some courts have extended the doctrine to permit warrantless entries into and searches of the home.[4] *Compare, e.g.*, *Ray v. Twp. of Warren*, 626 F.3d 170, 177 (3d Cir.2010) ("We * * * interpret the Supreme Court's decision in [*Dombrowski*] as being expressly based on the distinction between automobiles and homes for Fourth Amendment purposes. The community caretaking doctrine cannot be used to justify warrantless searches of a home.") *with, e.g.*, *State v. Pinkard*, 327 Wis.2d 346, 363 (2010) ("[U]nder certain circumstances a reasonably exercised community caretaker function may permit a warrantless entry into a home * * *."). As the doctrine has developed, "the community caretaking rubric has become 'a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities.'" *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir.2014), quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 785 (1st Cir.1991). Consequently, it is unsurprising that courts have struggled to

---

[4] Because this appeal involves the stop of an automobile on a public highway, we do not concern ourselves with the question of whether the community caretaking doctrine should extend beyond the context of automobiles to residences.

consistently frame the scope of the exception and differentiate it from other Fourth Amendment exceptions.

{¶27} As explained by the First Circuit Court of Appeals:

[C]ourts do not always draw fine lines between the community caretaking exception and other exceptions to the warrant requirement. The juxtaposition between the community caretaking exception and the emergency aid exception furnishes an apt illustration of this overlap. Some courts have treated emergency aid as a freestanding exception to the warrant requirement. Others have classified emergency aid as "a subcategory of the community caretaking exception." *People v. Ray*, 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, 933 (1999). Indeed, some courts have held that giving the community caretaking exception a life in the home independent and apart from the emergency aid exception "would render the emergency-aid doctrine obsolete." [*State v.*] *Vargas*, [213 N.J. 301,] 63 A.3d [175,] at 189 [(2013)]. The other side of the coin is that some courts continue to insist on a sharp line of demarcation between the emergency aid exception and the community caretaking exception. The same sort of disarray is evident in the manner in which courts have attempted to define the interface between the exigent

circumstances exception to the warrant requirement and the community caretaking exception. For example, some courts "apply what appears to be a modified exigent circumstances test, with perhaps a lower threshold for exigency if the officer is acting in a community caretaking role." *Twp. of Warren*, 626 F.3d at 176. Other courts steadfastly maintain that the exceptions are not congruent and must be analyzed and applied distinctly.

Given the profusion of cases pointing in different directions, it is apparent that the scope and boundaries of the community caretaking exception are nebulous.

(Citations and footnotes omitted.) *Id.* at 13-14. The First Circuit's observations are addressed specifically to the extent to which those courts that extend the community caretaking exception to warrantless searches of the home blend the community caretaking exception with the emergency aid and exigent circumstances exceptions in that context. However, the community caretaking exception has also been correlated with the emergency aid and exigent circumstances exceptions in the context of automobile stops. *See, e.g.*, *United States v. Toussaint*, 838 F.3d 503, 507 (5th Cir.2016).

{¶28} Amidst this doctrinal uncertainty, the Supreme Court of Ohio decided *State v. Dunn*, the case the trial court used to conclude that the stop of Moiduddin's

vehicle was not valid under the community caretaking exception. In *Dunn*, a law enforcement officer received a dispatch that a suicidal man driving a tow truck was in possession of a weapon and intended to kill himself when he arrived at a specified address. 131 Ohio St.3d 325, 2012-Ohio-1008, at ¶ 2. En route to the given address, the law enforcement officer spotted the tow truck. *Id.* at ¶ 3. He then executed a traffic stop of the tow truck, later finding a loaded firearm in the glovebox of the tow truck. *Id.* at ¶ 4-5. Dunn was subsequently indicted on one count of improper handling of a firearm in a motor vehicle, and he moved to suppress evidence on grounds that the traffic stop violated his rights under the Fourth Amendment. *Id.* at ¶ 7. The trial court overruled Dunn's motion to suppress but the trial court's ruling was subsequently reversed on appeal. *Id.* at ¶ 8-9.

{¶29} In reversing the appellate court's decision, the Supreme Court of Ohio stated: "There are a number of exceptions to the Fourth Amendment warrant requirement, including the one applicable to this case, the community-caretaking exception, which courts sometimes refer to as the 'emergency-aid exception' or 'exigent-circumstance exception.'" *Id.* at ¶ 15. The court noted that the Supreme Court of the United States had referred to the community caretaking exception as the "emergency-aid exception" and that its own precedents discussed the exception under the term "exigent circumstances" rather than "community caretaking." *Id.* at ¶ 18-20, citing *Michigan v. Fisher*, 558 U.S. 45, 130 S.Ct. 546 (2009), *Brigham City*

*v. Stuart*, 547 U.S. 398, 126 S.Ct. 1943 (2006), *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408 (1978), and *State v. Applegate*, 68 Ohio St.3d 348 (1994). According to the court, the "community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement is necessary to allow police to respond to emergency situations where life or limb is in jeopardy." *Id.* at ¶ 21.

**{¶30}** On its face, *Dunn* appears to stand for the proposition that "community caretaking" is synonymous with "emergency aid" or assistance rendered under "exigent circumstances." *See id.* at ¶ 15. However, examining the cases of the Supreme Court of the United States cited in *Dunn* and the Supreme Court of Ohio's own precedents, there is good reason to believe that, whatever overlap might exist between the community caretaking, emergency aid, and exigent circumstances exceptions, the concepts are not entirely interchangeable.

**{¶31}** First, the decisions of the Supreme Court of the United States relied on by the court in *Dunn* do not limit application of the community caretaking exception to instances where law enforcement officers possess an objectively reasonable belief that they must intervene immediately in order to protect life or prevent injury. Importantly, *Dombrowski*, the source of the community caretaking doctrine, did not itself involve an "emergency" or "exigency" of the type present in *Dunn*. In *Dombrowski*, the justification for the warrantless search of Dombrowski's vehicle was "concern for the safety of the general public who *might* be endangered

if an intruder removed a revolver from the trunk of the vehicle." (Emphasis added.) 413 U.S. at 447. Thus, it was law enforcement's interest in neutralizing the possibility of harm, rather than its need to respond to the probability of imminent injury or death, that justified the warrantless search. Furthermore, in subsequent applications of *Dombrowski*, the court held that, pursuant to the community caretaking function, law enforcement officers may impound vehicles and conduct standardized inventory searches of those vehicles. *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092 (1976). Neither of these cases was decided on the basis that impounding and inventorying the vehicles were reasonable because law enforcement officers were presented with an urgent need to intervene to prevent injury or death. Instead, impounding and inventorying the contents of the vehicles were justified by a generalized interest in "guard[ing] the police from danger" posed by potential hazards in the vehicles as well as interests in "protect[ing] [the] owner's property while it [was] in the custody of the police * * * [and] insur[ing] against claims of lost, stolen, or vandalized property." *Bertine* at 372. Hence, the most direct guidance from the Supreme Court of the United States suggests that, as community caretakers, law enforcement officers may conduct certain searches and seizures in circumstances bereft of emergency or exigency.

**{¶32}** Moreover, in *Dunn*, the Supreme Court of Ohio relied heavily on the Supreme Court of the United States's opinions in *Mincey*, *Brigham City*, and *Fisher* to support its equation of the community caretaking exception with the emergency aid and exigent circumstances exceptions. However, *Mincey*, *Brigham City*, and *Fisher* do not couch their holdings in terms of "community caretaking," and the phrase does not appear in the opinions. In fact, the only mention in either *Mincey*, *Brigham City*, or *Fisher* to *Dombrowski* or any of its direct progeny is a single reference in *Mincey* to Justice Powell's concurrence in *Opperman*. *See Mincey*, 437 U.S. at 390, citing *Opperman* at 381 (Powell, J., concurring).

**{¶33}** Finally, the Supreme Court of Ohio's pre-*Dunn* and post-*Dunn* jurisprudence suggests that the court itself does not limit the community caretaking exception to instances where law enforcement officers possess an objectively reasonable belief that they must intervene immediately in order to protect life or prevent injury. In numerous cases predating *Dunn*, the court, frequently relying on *Dombrowski*, *Bertine*, or *Opperman*, recognized that law enforcement officers may impound vehicles and conduct inventory searches in their roles as community caretakers. *E.g.*, *Blue Ash v. Kavanagh*, 113 Ohio St.3d 67, 2007-Ohio-1103, ¶ 11. Likewise, after *Dunn*, the court acknowledged that "[i]nventory searches performed pursuant to standard police procedure on vehicles taken into police custody as part of a community-caretaking function are reasonable." *State v. Leak*, 145 Ohio St.3d

165, 2016-Ohio-154, ¶ 21, citing *Opperman* at 373.[5]  Finally, there are further indications from the post-*Dunn* court that the community caretaking function encompasses more than the administration of emergency aid.  *See State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, ¶ 50 (Kennedy, J., concurring in judgment only) ("The United States Supreme Court has recognized the caretaking function of law enforcement in relation to motor vehicles *and* in rendering emergency aid.") (Emphasis added.), citing *Dombrowski* at 441, *Mincey* at 392, and *Fisher*, 558 U.S. at 47.

{¶34} Therefore, although *Dunn* can be read to suggest that the community caretaking, emergency aid, and exigent circumstances exceptions are fungible, we believe that *Dunn* is better understood as representing the view that the emergency aid and exigent circumstances exceptions fall under the broader umbrella of "community caretaking."  By implication, then, there may be some actions taken by law enforcement officers that do not fit under the emergency aid or exigent circumstances exceptions but that are nevertheless justifiable because they were carried out in order to discharge a duty under another facet of the community caretaking function.

{¶35} Returning to the parties' arguments, Moiduddin argues that the trial court was correct in applying *Dunn* to conclude that the stop of his vehicle was

---

[5] *Leak* was a plurality opinion.

unconstitutional because "the totality of the circumstances * * * d[id] not suggest that there was an immediate need for assistance to protect life or prevent serious injury." (Appellee's Brief at 5-6); (Doc. No. 36). However, in light of the preceding discussion, we conclude that the trial court erred by relying exclusively on *Dunn* to hold that the stop of Moiduddin's vehicle was not justified under the community caretaking exception. Even assuming that the trial court correctly concluded that Moiduddin's "slow speed alone d[id] not create a reasonable belief that there was an immediate need for assistance to prevent death or serious injury," we still find that Trooper Byers was executing a community caretaking function when he stopped Moiduddin's vehicle. Thus, we conclude that the stop of Moiduddin's vehicle was permissible under the community caretaking exception.

{¶36} As this court has previously held, "[w]hile *Terry* and much of its progeny stand for the proposition that a police officer generally needs a reasonable suspicion, based on specific and articulable facts, that an occupant of a vehicle is or has been engaged in *criminal* activity, nothing in the Fourth Amendment requires that the 'specific and articulable facts' relate to suspected criminal activity." (Emphasis sic.) *State v. Norman*, 136 Ohio App.3d 46, 53 (3d Dist.1999). We concluded that to insist that every vehicle stop be supported by a reasonable, articulable suspicion of criminal activity would be to "overlook[] the police officer's legitimate role as a public servant designed to assist those in distress and to maintain

and foster public safety." *Id.* Thus, "under appropriate circumstances[,] a law enforcement officer may be justified in approaching a vehicle * * * without needing any reasonable basis to suspect criminal activity * * * to carry out 'community caretaking functions' to enhance public safety." *Id.* at 54. As with all searches and seizures, the "key to * * * permissible police action" when conducting community caretaking functions is reasonableness. *Id.* Provided that a law enforcement officer is "able to point to reasonable, articulable facts upon which to base her safety concerns," the brief seizure of an automobile and its occupants will be deemed reasonable. *Id.*

{¶37} While we have had difficulty locating an Ohio case endorsing the principle that a law enforcement officer is justified in effecting a community caretaking stop of a vehicle doing little more than driving at an unusually slow, albeit noncriminal, speed, decisions of the courts of our sister states support that such stops are constitutionally reasonable. *See Trejo v. State*, 76 So.3d 684, 689-690 (Miss.2011) (holding that a law enforcement officer may perform a community caretaking stop of a motorist whose slow driving suggests that they are falling asleep, but concluding that driving between 58-60 miles per hour in a zone with a speed limit of 70 miles per hour, without more, does not support a reasonable inference that the driver is at risk of falling asleep); *State v. Rincon*, 122 Nev. 1170, 1175-1176 (2006) ("Absent reasonable suspicion, and under very limited and

narrow circumstances, an inquiry stop of a slow driver may also be permissible pursuant to the community caretaking exception to the Fourth Amendment."); *State v. Rinehart*, 617 N.W.2d 842, 843-844 (S.D.2000); *Ortega v. State*, 974 S.W.2d 361, 363-364 (Tex.App.1998); *State v. Martinez*, 260 N.J.Super 75, 77-78 (1992) (abnormally slow speed suggests number of objectively reasonable concerns including: "something might be wrong with the car * * * [and] a traffic safety hazard is presented to drivers approaching from the rear when an abnormally slow moving vehicle is operated at night on a roadway without flashers"); *contra State v. Bacher*, 170 Ohio App.3d 457, 2007-Ohio-727, ¶ 14 (1st Dist.) (community caretaking exception inapplicable where only apparent indication that driver might have been in distress was the fact that the vehicle was moving at 42-43 miles per hour in a zone with a speed limit of 65 miles per hour). We join these courts and conclude that in some circumstances, a law enforcement officer may be justified in effecting a community caretaking stop of an abnormally slow-moving vehicle to, at the very least, determine whether the vehicle is suffering from a mechanical malfunction and to temporarily remove the hazard of an excessively slow-moving vehicle from fast-moving traffic.

{¶38} Here, Trooper Byers testified that because of the abnormally slow speed at which Moiduddin's vehicle was traveling, he was concerned that Moiduddin's vehicle was experiencing mechanical problems or that Moiduddin was

suffering from a "medical episode." (Apr. 5, 2018 Tr. at 28-29). Trooper Byers also indicated that he was concerned for Moiduddin's safety and for the safety of other motorists on the highway due to the risk that a much faster moving vehicle could collide with Moiduddin's slow-moving vehicle. (*See id.* at 29, 36, 55). Thus, rather than basing his stop on a generalized "hunch" that the driver of the vehicle was in distress or that public safety was endangered, Trooper Byers articulated specific facts upon which his concerns were based. Although the circumstances do not necessarily suggest that immediate assistance was needed to prevent serious injury or death, the circumstances do support that Trooper Byers's safety concerns were legitimate and reasonable and that he was justified in stopping Moiduddin's vehicle to dispel these concerns.

{¶39} Nevertheless, Moiduddin argues that the stop of his vehicle was not constitutionally valid because "[t]here is no mention of a medical episode in Trooper Byers's Statement of Facts and his conduct of pacing the vehicle for a significant amount of time is contrary to any belief of immediate need for assistance." (Appellee's Brief at 6). Moiduddin's argument is without merit. As the Supreme Court of the United States has stressed repeatedly, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" (Emphasis sic.) *Brigham City*, 547 U.S. at 404, quoting *Scott v. United States*, 436 U.S. 128, 138,

98 S.Ct. 1717 (1978). Here, the circumstances, when viewed objectively, support that a community caretaking stop of Moiduddin's vehicle was justified to determine whether Moiduddin's car was functioning properly and to briefly remove his vehicle from the flow of traffic, thereby fostering and enhancing public safety. Thus, the stop of Moiduddin's vehicle was reasonable regardless of Trooper Byers's subjective beliefs or of the fact that he hesitated in stopping Moiduddin's vehicle.

**{¶40}** Similarly, the fact that Trooper Byers testified that he stopped Moiduddin's vehicle for a potential violation of R.C. 4511.22 does not defeat application of the community caretaking exception. Although *Dombrowski* speaks of community caretaking functions as those "totally divorced" from the detection and investigation of violations of criminal statutes, "[a]s an officer goes about his or her duties, an officer cannot always ascertain which hat the officer will wear— his law enforcement hat or her community caretaker hat." *State v. Kramer*, 315 Wis.2d 414, 433 (2009). Consequently, law enforcement officers may encounter situations where both their law enforcement and their community caretaking functions are implicated. As noted above, an officer's subjective motivations have no bearing on the question of whether a search or seizure is reasonable under the Fourth Amendment. *Brigham City* at 404-405. Therefore,

> so long as a police officer is able to point to specific, objective, and
>
> articulable facts which, standing alone, reasonably would suggest that

his assistance is necessary, a coinciding subjective law enforcement concern by the officer will not negate the validity of [a search or seizure] under * * * the community caretaking doctrine.

*Livingstone*, 644 Pa. at 74. *See McCormick*, 494 S.W.3d at 686-687; *Kramer* at 432-435; *State v. Smathers*, 232 N.C.App. 120, 127-128 (2014). Under the circumstances, it would have been objectively reasonable for any law enforcement officer to perform a community caretaking stop of Moiduddin's vehicle. Accordingly, it is irrelevant whether Trooper Byers's stop of Moiduddin's vehicle was partially motivated by an interest in enforcing the traffic laws.

**{¶41}** In sum, we conclude that the trial court erred by holding that the stop of Moiduddin's vehicle was not justified under the community caretaking exception. As a result, we conclude that the trial court erred by granting Moiduddin's motion to suppress.

**{¶42}** Having concluded that the trial court erred by granting Moiduddin's motion to suppress, we now consider whether the trial court also erred by dismissing the indictment against Moiduddin. In this case, it appears that the trial court's decision to dismiss the indictment was predicated on its assessment that, having granted Moiduddin's motion to suppress, the State was left with insufficient evidence to prosecute Moiduddin for the crimes with which he was charged. (*See* Doc. No. 36). Given that we have determined that the trial court's decision to grant

Moiduddin's motion to suppress was in error, we have little difficulty reversing the trial court's dismissal of the indictment as the ostensible basis for the dismissal has been fatally undermined. However, even if the trial court had been correct in granting Moiduddin's suppression motion, we would still conclude that the trial court erred by dismissing the indictment.

**{¶43}** "If a trial court finds a Fourth Amendment violation, the remedy is suppression of the wrongfully obtained evidence, not dismissal." *State v. Lassiter*, 8th Dist. Cuyahoga No. 92278, 2009-Ohio-3893, ¶ 5. *See State v. Sanders*, 7th Dist. Columbiana No. 12 CO 35, 2013-Ohio-5220, ¶ 13; *State v. Marcum*, 12th Dist. Butler Nos. CA2005-10-431 and CA2005-20-446, 2006-Ohio-2514, ¶ 9. Neither appellate courts nor trial courts "possess adequate or complete prosecutorial information and are [thus] unable to make an informed judgment whether sufficient evidence remains to prosecute." *State v. Malone*, 6th Dist. Erie No. E-03-060, 2004-Ohio-3794, ¶ 20, citing *State v. Bertram*, 80 Ohio St.3d 281, 284 (1997). As a result, "[d]ismissal of a case by the trial court after granting a motion to suppress is error because it deprives the state of its opportunity to determine the sufficiency of its own case." *Marcum* at ¶ 10, citing *State v. Hamilton*, 97 Ohio App.3d 648, 651 (3d Dist.1994). After a trial court grants a motion to suppress, "[t]he state is permitted to determine whether it will seek a stay of proceedings to pursue a Crim.R. 12 appeal or alternatively proceed to a final judgment." *Id.*, citing *Malone* at ¶ 19, citing *State*

*v. Fraternal Order of Eagles Aerie 0337 Buckeye*, 58 Ohio St.3d 166, 169 (1991). "'While the state may have a tougher row to hoe without the availability of suppressed evidence, it does not necessarily follow that, as a matter of law, the defendant is entitled to dismissal of the charge.'" *Id.* at ¶ 11, quoting *State v. Couch*, 2d Dist. Montgomery No. 17520, 1999 WL 961264, *5 (June 25, 1999).

**{¶44}** Therefore, regardless of whether the trial court correctly or incorrectly granted Moiduddin's motion to suppress evidence, the trial court erred when it dismissed the charges pending against Moiduddin. *See Malone* at ¶ 21.

**{¶45}** The State's assignment of error is sustained.

**{¶46}** Having found error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**SHAW, J., concurs.**

**/jlr**


**WILLAMOWSKI, J., concurring in part and dissenting in part.**

**{¶47}** I concur with the majority that the trial court should not have dismissed the case upon granting the motion to suppress. The decision whether to proceed with the case without the suppressed evidence is one for the prosecutor to make.

However, I dissent from the majority opinion in its decision to reverse the judgment granting the motion to suppress. If this is a question of law being misunderstood by the trial court, as would permit this court to reverse the judgment of the trial court, then the matter should be remanded to the trial court for it to reconsider its decision using the correct legal standard. I fully agree with the majority that in an appropriate situation an officer can stop a driver for driving at a speed substantially under the posted limit as part of the caretaking function. However, in this case the officer's testimony regarding the reasons for the stop could either support a finding that the stop was for the purpose of his caretaking functions or the trial court could determine that based upon the other facts, this claim lacked credibility. If the trial court used the correct standard of law, but found the officer's claim of using the caretaking function was not credible, then that is a question of fact that we should not overturn and the judgment should be affirmed.

{¶48} A review of the trial court's judgment shows that the trial court specifically considered the possibility of the caretaking function as a basis for a stop. It noted that the Supreme Court of Ohio has held as follows:

> **The community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement allows a law-enforcement officer with objectively reasonable grounds to believe that there is an immediate need for his or her assistance to protect life or prevent serious injury to effect a community-caretaking/emergency-aid stop.**

*State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, ¶ 26, 964 N.E.2d 1037. The trial court then determined in fact that there was no evidence that suggested an immediate need for assistance to protect life or prevent serious injury in this case.

{¶49} On appeal, the determination of the facts is left to the discretion of the trial court. *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, ¶ 12, 47 N.E.3d 821. An appellate court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8, 797 N.E.2d 71. As noted above, the community caretaker function can be claimed as an exception to the Fourth Amendment warrant requirement if the officer credibly can cite to specific facts which would lead an objective, reasonable person to believe that there is an immediate need for assistance to protect life or prevent serious injury. Slow speed alone is not sufficient for determining that emergency aid is required. *State v. Bacher*, 170 Ohio App.3d 457, 2007-Ohio-727, ¶ 14, 867 N.E.2d 864 (holding that traveling at a speed of 22-23 miles per hour below the posted speed limit on the interstate without other evidence of an emergency was insufficient to support a stop on the basis of the community caretaking function.

{¶50} In this case, the trial court specifically found no such facts were present. The only evidence presented was a slow speed from which the officer testified that he thought there could be a medical issue. Tr. 28-29. However, he

also conceded that he did not mention that belief in his report. Tr. 52. The officer admitted that he pulled Moiduddin over for a slow speed violation. Tr. 44. The trial court determined that the officer had not presented evidence from which an objective, reasonable person could conclude there was an immediate need for aid. Although the officer stated that he was concerned about a medical issue, the trial court could have chosen to disbelieve this testimony as that is the province of the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). The trial court found this case to be more like the situation in *Bacher*. Having found no factual support for "an immediate need for assistance to protect life or prevent serious injury", the trial court determined that the caretaking exception to the Fourth Amendment did not apply in this case. Doc. No. 36. As the factual findings of the trial court are supported by some competent, credible evidence, this Court should accept the findings of fact. *Leak, supra*. Applying the law to those facts, I would affirm the judgment of the trial court as to suppression. For this reason, I respectfully concur in part and dissent in part from the majority opinion.