[Cite as *State v. Davis*, 2009-Ohio-2527.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

   PLAINTIFF-APPELLEE,                        CASE NO. 1-08-62

   v.

AUNDRE D. DAVIS,                      O P I N I O N

   DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2008-0091

**Judgment Affirmed**

**Date of Decision:  June 1, 2009**

APPEARANCES:

   *F. Stephen Chamberlain* for Appellant

   *Terri L. Kohlrieser* for Appellee

**WILLAMOWSKI, J.**

{¶1} The defendant-appellant, Aundre Davis, appeals the Allen County Common Pleas Court's judgment entry of August 27, 2008 convicting him on two counts of breaking and entering and one count of grand theft following jury trial and sentencing him to an aggregate prison term of three and one-half years. On appeal, Davis contends that the trial court should have granted his motion to suppress; that the trial court should have granted his motion in limine; and that the convictions were against the manifest weight of the evidence. For the reasons set forth herein, we affirm the judgment of the trial court.

{¶2} On April 17, 2008, the Allen County Grand Jury indicted Davis on two counts of breaking and entering, violations of R.C. 2911.13(A), fifth-degree felonies, and one count of grand theft of a motor vehicle, a violation of R.C. 2913.02(A)(1) and (B)(5), a fourth-degree felony. In May 2008, Davis filed two separate motions to suppress evidence. The first motion sought the suppression of statements he had made to law enforcement, and the second sought to suppress any evidence gathered as the result of an allegedly unlawful detention and arrest. The court held a suppression hearing on June 4, 2008, and on June 9, 2008, filed its judgment entry overruling each of Davis' motions.

{¶3} On June 13, 2008, Davis filed a motion in limine seeking to prevent the state of Ohio from presenting expert testimony at trial. In particular, Davis

challenged the state's witness from the Ohio Bureau of Criminal Identification and Investigation, Daniel Davison, who would link shoeprints found at one of the crime scenes to footwear recovered from Davis upon his arrest. The case proceeded to jury trial on August 25 and 26, 2008, during which time the court heard testimony from Davison outside the presence of the jury and overruled Davis' motion in limine. The jury found Davis guilty on each count of the indictment and determined that Davis had stolen a motor vehicle. The trial court ordered Davis to serve consecutive prison terms of twelve months on count one, 18 months on count two, and twelve months on count three; an aggregate sentence of three and one-half years. Davis appeals the judgment of the trial court and asserts three assignments of error for our review.

### Assignment of Error No. 1

**The trial court committed an error prejudicial to the defendant in failing to grant the defendant's motion to suppress his arrest and evidence gained as a result thereof.**

### Assignment of Error No. 2

**The trial court committed error prejudicial to the defendant in not granting the defendant's motion to exclude testimony regarding shoe imprint evidence offered by the State of Ohio.**

### Assignment of Error No. 3

**Defendant's conviction was against the manifest weight of the evidence.**

**{¶4}** In the first assignment of error, Davis argues that the police lacked probable cause for arrest when they took him into custody for public intoxication, a violation of R.C. 2917.11(B). Davis emphasizes the fact that he was not charged with the offense following his arrest. In response, the state claims Davis was arrested for intoxication, a violation of Lima City Ordinance 612.18. The state recognizes that generally, law enforcement officers may not arrest suspects for minor misdemeanor offenses. However, the state argues that Davis' refusal to provide identification justified the arrest under R.C. 2935.26.

**{¶5}** We stress that Davis has not appealed the initial stop and detention. The first assignment of error addresses the sole issue of his arrest. Suppression motions present mixed questions of law and fact during appellate review. *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 50, quoting *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8; quoting *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Accepting the trial court's findings of fact, if they are supported by competent, credible evidence, an appellate court must determine "whether the facts satisfy the applicable legal standard." Id., quoting *Burnside*, at ¶ 8, citing *State v. Fanning* (1982), 1 Ohio St. 3d 19, 20, 437 N.E.2d 583; *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539.

**{¶6}** A warrantless arrest in a public place based on probable cause does not violate the Fourth Amendment of the United States Constitution. *State v.*

*Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, at ¶ 38, citing *United States v. Watson* (1976), 423 U.S. 411, 423-424, 96 S.Ct. 820, 46 L.Ed.2d 598; *United States v. Santana* (1976), 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300. "Probable cause for a warrantless arrest requires that the arresting officer, at the time of the arrest, possess sufficient information that would cause a reasonable and prudent person to believe that a criminal offense has been or is being committed." *Elmore*, at ¶ 39, citing *Gerstein v. Pugh* (1975), 420 U.S. 103, 111-112, 95 S.Ct. 854, 43 L.Ed.2d 54; *Beck v. Ohio* (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142. In determining whether probable cause for an arrest existed, we must examine the totality of facts and circumstances surrounding the arrest. See *State v. Homan* (2000), 89 Ohio St.3d 421, 427, 732 N.E.2d 952.

{¶7} At the suppression hearing held on June 4, 2008, the state presented the testimony of Michael Carman, a patrolman who had worked for the Lima Police Department for 13 years, and Steven Stechschulte, who had worked for the Lima Police Department for 16 years and had been a detective for approximately one and one-half years. Carman testified that he stopped Davis after observing the shoeprints Davis was leaving in the snow. The shoeprints left by Davis were similar to other shoeprints Carman had observed around other crime scenes that morning. Davis claimed he had no proof of identification but told Carman his

name was "John Benson."[1] (Hearing Tr., Dec. 15, 2008, at 6). As Carman talked with Davis, he noticed the strong odor of alcoholic beverage on Davis' breath and observed that Davis' eyes were bloodshot and glassy. (Id.). Carman concluded that Davis was "obviously intoxicated." (Id.).

{¶8} Carman asked dispatch to run the name "John Benson" both "in-house" and through "NCIC." Neither database contained any information for that person. (Id.). By that time, Stechschulte had approached Davis as well. Stechschulte testified that he recognized Davis' face from prior interaction with him, but he was unable to recall Davis' name. (Id. at 26). Because of his prior interaction with Davis and because the database search had resulted in no matches for "John Benson," Stechschulte knew Davis had provided false information. (Id.). Stechschulte also detected the odor of alcoholic beverage on Davis' breath and observed that his eyes were bloodshot. (Id.). Both officers testified that Stechschulte ordered Davis' arrest for intoxication since he could not provide identification. (Id. at 12; 26). Stechschulte identified Davis as the person who was arrested for intoxication in the early morning hours of February 22, 2008 and stated that he decided not to pursue the misdemeanor offenses since Davis was being charged with three felonies. Exhibit 4 was the booking form used by the Lima Police Department, which indicated that Davis had been arrested for intoxication under Lima City Ordinance 612.18. (Id. at Ex. 4).

---

[1] Davis' state identification card was located in the back pocket of his pants following his arrest.

{¶9} Despite counsels' contentions, both throughout trial and on appeal, Davis was not arrested for public intoxication, a violation of R.C. 2917.11(B). Instead, Davis was arrested for intoxication, a violation of Lima City Ordinance 612.18, which states:

> **(a)** **No person shall be found in the state of intoxication or, being intoxicated, shall disturb the peace and good order or shall conduct himself or herself in a disorderly manner.**
>
> **(b)** **Whoever violates this section is guilty of a minor misdemeanor.**

See (Hearing Tr., at 12; 26; Ex. 4). Law enforcement may effectuate a warrantless arrest for a minor misdemeanor only under limited circumstances. *State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175, at ¶ 18-19, quoting *State v. Jones* (2000), 88 Ohio St.3d 430, 440, 727 N.E.2d 886; R.C. 2935.26. One of the statutory exceptions in R.C. 2935.26, which allow warrantless arrests for minor misdemeanors, states, "the offender cannot or will not offer satisfactory evidence of his identity." R.C. 2935.26(A)(2). In this case, the evidence was clear that Davis was "obviously intoxicated," and he had refused to offer satisfactory evidence of his identity. Based on the totality of the circumstances, there was probable cause to arrest Davis for intoxication. The first assignment of error is overruled.

{¶10} For ease of analysis, we elect to address the remaining assignments of error together. In the second assignment of error, Davis argues that the trial

court erred by qualifying Daniel Davison as an expert witness in footwear comparison. Specifically, Davis contends that the technique used by Davison had not been subjected to testing; that the literature upon which Davison relied had been authored by an expert witness whose claim to fame was his testimony in the O.J. Simpson murder trials; that there was no known error rate for the technique used; and that the technique had not attracted widespread acceptance within the scientific community. In the third assignment of error, Davis contends his convictions were against the manifest weight of the evidence.

{¶11} A challenge based on the manifest weight of the evidence requires an appellate court to sit "as a 'thirteenth juror.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652.

> **Weight of the evidence concerns "the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*"**

(Emphasis added.). Id. at 387, quoting Black's Law Dictionary (6 Ed.1990), at 1594. When an appellant challenges a conviction based on the weight of the evidence, the court must review the entire record, weigh the evidence and "all reasonable inferences," consider witness credibility, and determine whether "the

jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. To reverse a conviction based on the manifest weight of the evidence, a unanimous panel of three appellate judges must concur. *State v. Michaels* (Dec. 15, 1999), 3d Dist. No. 13-99-41, citing *Thompkins*, at 389.

{¶12} Davis was convicted on two counts of breaking and entering. R.C. 2911.13(A) states, "[n]o person by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony." "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). The term "unoccupied structure" is not defined in the Revised Code; however, the Supreme Court of Ohio has determined that an "unoccupied structure" would include any structure not defined as an "occupied structure" under R.C. 2909.01. See *State v. Carroll* (1980), 62 Ohio St.2d 313, 314-315, 405 N.E.2d 305. R.C. 2909.01(C) states:

> **"Occupied structure" means any \* \* \* building, \* \* \* or other structure \* \* \* to which any of the following applies:**
>
> **(1)    It is maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied and whether or not any person is actually present.**

**(2)     At the time, it is occupied as the permanent or temporary habitation of any person, whether or not any person is actually present.**

**(3)     At the time, it is specially adapted for the overnight accommodation of any person, whether or not any person is actually present.**

**(4)     At the time, any person is present or likely to be present in it.**

Davis was also convicted on one count of grand theft. R.C. 2913.02 provides:

**(A)     No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:**

**(1)     Without the consent of the owner or person authorized to give consent;**

**\* \* \***

**(B)(5) If the property stolen is a motor vehicle, a violation of this section is grand theft of a motor vehicle, a felony of the fourth degree.**

{¶13} At approximately 3:00 a.m. on February 22, 2008, a security company contacted the Lima Police Department to report that a security alarm had been triggered at Pagers Depot, located on North Metcalf Street in Lima, Ohio. (Trial Tr., Dec. 15, 2008, at 230). Robert Sarchet, who had been a patrolman with the Lima Police Department for 32 years, was dispatched to the business. When he arrived at the store, Sarchet immediately noticed that the glass in the front of the business had been smashed with a concrete block. (Id. at 231). Sarchet located a distinctive shoeprint and tracks from what appeared to be a small two-

wheeled cart in the freshly fallen snow, and he believed that merchandise had been removed from the store. (Id. at 231; 234). Sarchet preserved the shoeprint with a large box and contacted the store owner, who later confirmed that 13 cell phones had been stolen. (Id. at 239; 248; 264). The store owner testified that nobody was permitted in his store after hours. (Id. at 266).

{¶14} Mark Link, who had been employed by the Lima Police Department for 17 years, also arrived at Pagers Depot and traced the distinctive shoeprints and cart tracks from the store to an apartment building at 424 North Metcalf Street. (Id. at 378). The shoeprints and cart tracks were then traced to a residence at 108 West Circular Street by Link and fellow police officers Mike Carman and Robert Hillard. (Id. at 281-283; 349; 382). The officers traced the shoeprints and cart tracks from their cruisers by circling each city block to locate where the tracks entered and exited each block between those two locations. During this time, Shawn Niedemire, a patrolman who had been employed by the Lima Police Department for 11 years, stopped a black male who was walking in the 500 block of South West Street. (Id. at 493). The person identified himself as Aundre Davis and told Niedemire he was walking home from a friend's house. (Id.). At that time, Davis was wearing a black and green jacket and a brown baseball cap. (Id. at 493-494).

{¶15} At 108 W. Circular St., the officers located shoeprints and cart tracks at the back of the residence, and Sarchet confirmed Carman's verbal description of

the shoeprints as similar to the shoeprints that had been located at Pagers Depot. (Id. at 279). At that point, Carman and Link realized that the tracks had been made as the suspect walked from 108 W. Circular St. to 424 N. Metcalf St. (Id. at 285; 382).

{¶16} Carman returned to 424 N. Metcalf St., and he, Hillard, and Detective Steven Stechschulte began talking to residents of the three apartments located in the building. (Id. at 289). Hillard went outside as Stechschulte was speaking with the resident who lived in the first-floor apartment. (Id. at 356). At that point, he noticed a gold Dodge Caravan parked on the wrong side of the street that had not been there previously. (Id. at 357). Looking through the window of the van, Hillard observed that the ignition had been "punched,"[2] so he informed Carman and Stechschulte by radio that they also had a stolen vehicle to investigate. (Id. at 290; 358). At that time, Davis walked northbound on the sidewalk past both Carman and Hillard. Both officers observed that the shoeprints left by Davis were similar to the shoeprints they had been following throughout the city that morning. (Id. at 292; 359). As stated in our discussion of the suppression motion, Davis was arrested for intoxication during his interaction with the officers. Sarchet transported Davis to the police department and took his clothing and shoes into evidence. Sarchet testified that Davis' outer pants (he had

---

[2] "Punching" an ignition is a common method used to steal cars.

been wearing several layers) were soaking wet, as were his socks and shoes. (Id. at 241).

{¶17} Hillard ran the license plate number of the van through dispatch, which returned the owner's name and address on South Elizabeth Street. At the victim's residence, Link observed an empty spot in the driveway where the snow had fallen around a vehicle, which had been subsequently moved. (Id. at 384). Link located shoeprints in the driveway that were similar to the shoeprints he had observed at Pagers Depot. (Id.). Link drove the owner of the van to 424 N. Metcalf St., where she identified the vehicle as hers. The owner testified that neither she nor her husband had authorized anybody else to drive their van. (Id. at 413).

{¶18} Outside of the driver's side door of the van, officers located shoeprints that appeared to match the shoeprints Davis had left on the sidewalk prior to his arrest. (Id. at 301; 307-308). Upon inspecting the interior of the van, the victim and officers located new clothing that did not belong to the victim. (Id. at 387; 411). The items still had store tags on them, and some items were on hangers. The clothing was described as "hip-hop" clothing. Also located in the van between the front seats was a concrete landscaping block that had snow and pieces of leaves on it.

{¶19} After finding the "hip hop" clothes in the van, the officers believed that a different business had also been broken into that morning, so Link began

patrolling the city to see if any of the urban clothing stores had been broken into. While he was doing so, Carman and Hillard followed the distinct shoeprints away from the stolen minivan. (Id. at 309-310; 367). As they were tracing the shoeprints, Carman located a black and green jacket next to a snow-covered, red Pontiac TransAm. The jacket had no snow over it, and two wet gloves were located in the front pockets. (Id. at 309-312). Niedemire identified the jacket, Exhibit 27, as the jacket Davis had been wearing when he was stopped earlier that morning in the 500 block of S. West St. (Id. at 494). Carman stopped tracing the shoeprints at that point, but Hillard continued to trace the shoeprints around the block. Hillard observed that the shoeprints stopped where Davis had been arrested a short time earlier. (Id. at 367).

{¶20} Meanwhile, during Link's canvas of the city, he discovered that Urban Gear, an urban clothing store located at 730 South Main Street, had also been broken into. (Id. at 388). Link found a concrete block holding open the front screen door, the glass was out of the interior door,[3] and the wicker blinds were hanging to the outside of the interior door. (Id. at 389-390). Link saw the same distinct shoeprint in the snow outside of Urban Gear that he had seen in the driveway at S. Elizabeth St. and at Pagers Depot. (Id. at 390).

{¶21} In an alley next to Urban Gear, Link located three baseball caps and the same distinct shoeprints. (Id. at 390). In the store, Link observed that a lot of

merchandise appeared to be missing. (Id. at 393). The store owner later confirmed that approximately $4,000 of inventory had been stolen and not recovered. (Id. at 483). He also testified that he never gave Davis permission to be in the store after hours. (Id. at 486). David Hammond, an identification officer with the Lima Police Department, testified that he collected several shoeprints from the panel of glass on the floor of Urban Gear by using a technique similar to that used to lift fingerprints. (Id. at 517-518).

{¶22} The exhibits admitted by the trial court included a photograph of the shoeprints and car tracks located outside of Pagers Depot; a photograph of the concrete blocks and broken glass on the floor inside of Pagers Depot; a photograph of the minivan parked in the wrong direction on the street; a photograph of the punched ignition; a photograph of the shoeprints located just outside the driver's door of the minivan; a photograph of footprints in the snow near a red Pontiac TransAm; a photograph of a black and green jacket lying on top the snow next to a red Pontiac TransAm; a photograph of three baseball caps lying in an alleyway; a photograph of the broken door glass lying on the floor inside Urban Gear; several photographs showing empty racks inside Urban Gear; photographs of some of the merchandise located in the minivan; and photographs of the landscaping block located inside the minivan. The jury was able to observe

---

[3] The panel of glass from the front door was found lying on the floor inside the business with several areas showing where the perpetrator had hit the glass with a block.

the black and green jacket, which had been recovered next to the Pontiac TransAm and which Niedemire identified as the defendant's; the baseball cap Neidemire identified as the defendant's; and one of the tennis shoes seized from the defendant following his arrest. Each officer admitted on cross examination that they had not received specialized training on footwear identification. However, Exhibit 23 was identified as the shoe taken from Davis during his arrest, and each officer testified that the tread pattern was the same pattern they had followed during their investigation on the morning of February 22, 2008. (Id. at 343; 375; 394-395).

{¶23} Finally, Daniel Davison testified. Davison had earlier testified outside the hearing of the jury on Davis' motion in limine, in which he sought to exclude Davison's testimony. The trial court overruled the motion in limine, and during trial, it qualified Davison as an expert in footwear comparison. Davison worked in the trace evidence department at the Ohio Bureau of Criminal Identification and Investigation. Since 2003, he had been approved to conduct footwear comparisons without supervision, and he had conducted approximately 120 examinations since that time. (Id. at 426-427). Davison indicated that he had been subjected to "in-house" training, had read articles in the International Association of Identification's journal and the Journal of Forensic Science, had read portions of William Bodziak's book, and had attended a 40-hour training session conducted by Bodziak. (Id. at 425). Previously, Davison had been

qualified as an expert witness by the Franklin County Common Pleas Court. (Id. at 428).

{¶24} Davison conceded that untrained people would be able to distinguish between different tread patterns on the bottom of shoes; however, he stated that untrained people should not be trusted to ascertain whether an impression came from a particular, specified shoe. (Id. at 429-430; 436). Davison explained the examination he typically does in conducting a footwear comparison, particularly the final step, in which he looks for any unusual or "accidental" characteristics in the tread pattern. Such "accidental" characteristics could result from damage to the bottom of a shoe, such as cuts, nicks, lodged stones, punctures, or burns. (Id. at 433). In this case, Davison was asked to compare the "unknown" impressions Hammond lifted from the glass at Urban Gear to the "known" impressions made by the bottom of Davis' confiscated tennis shoes. Davison opined that the unknown impression of a left shoe from the glass matched the known impression of Davis' left shoe; however, the unknown right shoe impression from the glass could not be conclusively linked to the known impression of Davis' right shoe. (Id. at 445-446; 580; 582).

{¶25} Even if the trial court did abuse its discretion when it qualified Davison as an expert witness, any such error would be harmless in light of the overwhelming circumstantial evidence of identification in this case. *State v. Lindsay*, 3d Dist. No. 8-06-24, 2007-Ohio-4490, at ¶ 18, citing *State v. Jenks*

(1981), 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus ("[c]ircumstantial evidence is good evidence and has the same probative value as direct evidence."). Niedemire had seen Davis walking the city's streets while officers were tracing the shoeprints and cart tracks from 424 N. Metcalf St. to 108 W. Circular St. At that time, Davis identified himself to Niedemire, who observed Davis' jacket and baseball cap. The jacket was subsequently found discarded on top of the freshly fallen snow a short distance away from 424 N. Metcalf St. Davis' hat was also introduced into evidence. Niedemire testified that both articles of clothing were the same as those he had observed Davis wearing when he stopped Davis on the morning of February 22, 2008.

{¶26} Multiple police officers, each with significant experience in law enforcement, testified that they observed shoeprints with the same distinct tread pattern outside of Pagers Depot, outside of Urban Gear, outside of 424 N. Metcalf St., outside of 108 W. Circular St., outside of the stolen minivan, and in the driveway at S. Elizabeth St. Furthermore, the jury observed for itself the photographs of the shoeprints located in the freshly fallen snow, and it had Exhibit 23, which was Davis' tennis shoe. Even without Davison's testimony matching one shoeprint lifted from Urban Gear to the tread pattern on Davis' left tennis shoe, the remaining evidence overwhelmingly supported the convictions. See *State v. DeWalt*, 7th Dist. No. 06 CA 835, 2007-Ohio-5248, at ¶ 34, citing *State v. Whitt* (1991), 68 Ohio App.3d 752, 753, 589 N.E.2d 492; *State v. Hartman* (2001),

93 Ohio St.3d 274, 287, 754 N.E.2d 1150; *State v. Scott,* 8th Dist. No. 88084, 2007-Ohio-2111, at ¶ 32; *State v. Jackson*, 10th Dist. No. 02AP-867, 2003-Ohio-6183, at ¶ 33 ("[i]n criminal cases, an error in the admission of expert testimony is deemed to be reversible error unless it is found to be harmless beyond a reasonable doubt."). Each element of each offense was supported by direct evidence, and as discussed above, there was more than sufficient circumstantial evidence identifying Davis as the offender. On this record, we cannot find that the jury clearly lost its way. The second and third assignments of error are overruled.

{¶27} The judgment of the Allen County Common Pleas Court is affirmed.

*Judgment affirmed*

**PRESTON, P.J., and ROGERS, J., concur.**

/jnc