[Cite as *State v. Ramos*, 2022-Ohio-886.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                      CASE NO. 9-21-32

    v.

RICK RAMOS,                               O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion Municipal Court
Trial Court No. TRC 19-7325

**Judgment Affirmed**

**Date of Decision:  March 21, 2022**

APPEARANCES:

    *Geoffrey Arthur Spall* **for Appellant**

    *Jeff Ratliff* **for Appellee**

**MILLER, J.**

{¶1} Defendant-appellant, Rick Ramos, appeals the September 8, 2021 judgment of the Marion Municipal Court. For the reasons that follow, we affirm.

## I. Facts & Procedural History

{¶2} Shortly after 3:00 a.m. on the morning of November 1, 2019, the Ohio State Highway Patrol received a complaint of a reckless vehicle driving north on U.S. 23 in Marion County. The caller indicated that "the vehicle was unable to maintain a lane for an extended period of time, multiple occasions [sic]." (Jan. 30, 2020 Tr. at 25). The caller also provided the dispatcher with a description of the vehicle, which was relayed to Trooper Matthew Dyer. The caller stayed on the phone with the dispatcher while Trooper Dyer positioned his patrol vehicle in the median facing northbound traffic on U.S. 23. From his position in the median, Trooper Dyer observed a Ford Mustang, which matched the caller's description, traveling north on U.S. 23. Using his speed-measuring device, Trooper Dyer recorded the vehicle as traveling 50 miles per hour—15 miles per hour under the posted speed limit.

{¶3} Once the vehicle had passed, Trooper Dyer pulled out from the median and followed the vehicle on U.S. 23 for approximately a half mile, during which time Trooper Dyer did not witness any traffic violations or additional signs of impaired driving. The driver of the vehicle then activated the vehicle's right turn

signal and exited U.S. 23. From there, the driver of the vehicle activated the vehicle's left turn signal and turned the vehicle onto State Route 95 traveling west. By this time, Trooper Dyer had learned that the vehicle was registered to a resident of the City of Marion, so he assumed the vehicle would continue along State Route 95 into Marion. However, the vehicle's left turn signal was soon activated and the vehicle turned onto the entrance ramp to U.S. 23 South, though it did not continue up the entrance ramp into southbound traffic. Instead, the vehicle pulled off to the right side of the entrance ramp, crossed completely over the solid white fog line, and began to come to a controlled stop on the berm. As the vehicle was rolling to a stop, Trooper Dyer positioned his cruiser behind the vehicle and activated his cruiser's overhead lights. At that point, according to the video admitted into evidence at the suppression hearing, approximately one minute and twenty seconds had elapsed since Trooper Dyer spotted the vehicle.

{¶4} Trooper Dyer then exited his patrol vehicle and established contact with the driver of the stopped vehicle, who was identified as Ramos. Trooper Dyer noticed that Ramos's eyes were bloodshot. He also observed that Ramos was missing multiple teeth, that he was "talkative," and that his movements were "just erratic" and "[k]ind of herky-jerky." (Jan. 30, 2020 Tr. at 14). Trooper Dyer did not detect the odor of alcohol or drugs emanating from Ramos or his vehicle, but he felt that Ramos's "mannerisms" were "sufficient" to further investigate whether

Ramos was driving under the influence of alcohol or drugs. (Jan. 30, 2020 Tr. at 15). Accordingly, Trooper Dyer ordered Ramos to exit the vehicle and directed Ramos to the front seat of his patrol vehicle. Trooper Dyer noted that Ramos "seemed a little confused" while walking to the patrol vehicle, observing that Ramos "would move from one space to another * * *, instead of walking perhaps in a straight line directly towards the vehicle." (Jan. 30, 2020 Tr. at 15). Trooper Dyer further noticed that, once inside the patrol vehicle, Ramos's pupils seemed constricted.

{¶5} Ramos denied consuming alcohol or drugs and explained to Trooper Dyer that he was a truck driver, that he had been awake for 30 hours, and that he was just tired. Nevertheless, Trooper Dyer subjected Ramos to a series of field sobriety tests. Trooper Dyer first attempted to administer the horizontal gaze nystagmus ("HGN") test. However, Ramos was unable to complete the HGN test because his eyes would "droop and go about halfway closed." (Jan. 30, 2020 Tr. at 16). Although Ramos stated that he had a lazy eye, Trooper Dyer considered the possibility that Ramos was "on-the-nod." (Jan. 30, 2020 Tr. at 16, 21). As Ramos was not able to "follow the stimulus," Trooper Dyer discontinued the HGN test. (Jan. 30, 2020 Tr. at 16). Trooper Dyer then had Ramos perform a walk and turn test and a one-leg stand test. (Jan. 30, 2020 Tr. at 17-18). Trooper Dyer observed "3 of the 4 clues" with respect to the one-leg stand test and "5 of the 8 clues" with

respect to the walk and turn test. (Jan. 30, 2020 Tr. at 18-19). Ramos also completed a non-standardized dexterity test, albeit less than perfectly. (Jan. 30, 2020 Tr. at 17). Finally, Trooper Dyer administered the modified Romberg test, the results of which indicated to Trooper Dyer that Ramos's "body clock seemed sped up." (Jan. 30, 2020 Tr. at 20).

{¶6} Based on his observations, Trooper Dyer placed Ramos under arrest on suspicion of "some type of poly drug use," meaning that "it may not have been the use of one drug per se, but the use of multiple drugs, that in turn would then make [Ramos] unable to drive a motor vehicle." (Jan. 30, 2020 Tr. at 22). While Trooper Dyer initially thought Ramos might have consumed heroin, he eventually concluded it was likely that Ramos had ingested some type of stimulant. Trooper Dyer also ruled out alcohol intoxication. Indeed, Ramos later submitted to a preliminary breath test and blew "triple zeroes." (Jan. 30, 2020 Tr. at 32-33). However, subsequent testing detected prohibited concentrations of amphetamine and methamphetamine in Ramos's urine.

{¶7} On November 4, 2019, a complaint was filed charging Ramos with one count of operating a vehicle under the influence of alcohol or drugs ("OVI") in violation of R.C. 4511.19(A)(1)(a)—a so-called "under-the-influence" OVI. On November 5, 2019, Ramos appeared for arraignment and entered a plea of not guilty.

{¶8} On November 15, 2019, Ramos filed a motion to suppress all evidence obtained as a result of his encounter with Trooper Dyer. Ramos argued that such evidence was obtained in violation of his constitutional rights because "[t]here was no lawful cause to stop [him], detain [him], or probable cause to arrest [him] without a warrant." A hearing on Ramos's motion to suppress was held on January 30, 2020. On February 10, 2020, the trial court denied Ramos's motion, concluding that the initial encounter between Ramos and Trooper Dyer was consensual, that Trooper Dyer had reasonable suspicion to expand the scope of the consensual encounter to investigate whether Ramos had committed an OVI, and that Trooper Dyer had probable cause to arrest Ramos.

{¶9} On March 2, 2020, a second complaint was filed charging Ramos with one count of OVI in violation of R.C. 4511.19(A)(1)(j)(i) and one count of OVI in violation of R.C. 4511.19(A)(1)(j)(ix). The second complaint charged Ramos with two so-called "per se" OVIs based on the concentration of amphetamine and methamphetamine in his urine. At arraignment, Ramos again pleaded not guilty.

{¶10} A jury trial was held on August 19, 2020. Before the jury was impaneled, the State moved to dismiss the under-the-influence OVI. The trial court granted the State's motion over Ramos's objection, and the under-the-influence OVI was dismissed. The trial proceeded, with both the State and Ramos presenting evidence before the matter was submitted to the jury. However, soon after the jury

had retired to deliberate, a dispute arose between jurors that interrupted the deliberations. In response to this disruption, the trial court called the jury back into the courtroom and issued a supplemental jury instruction. A short time later, the jury found Ramos guilty of the two per se OVIs as charged in the second complaint.

{¶11} The trial court proceeded immediately to sentencing. The trial court determined that the two per se OVI offenses would merge for purposes of sentencing. The State elected to have the trial court sentence Ramos for the R.C. 4511.19(A)(1)(j)(ix) offense, and the trial court sentenced Ramos to 180 days in jail and a $1000 fine. The trial court suspended 120 days of Ramos's jail sentence as well as $450 of the fine. Furthermore, the trial court suspended Ramos's driver's license for a period of 3 years. The trial court filed its original judgment entry of sentence on August 21, 2020.

## II. Assignments of Error

{¶12} On September 14, 2020, Ramos filed a notice of appeal. However, due to some deficiencies in the trial court's original judgment entry of sentence, we dismissed Ramos's appeal for lack of a final, appealable order on August 16, 2021. On September 8, 2021, the trial court issued a corrective judgment entry of sentence.

{¶13} Thereafter, on September 23, 2021, Ramos timely filed a second notice of appeal. He raises the following three assignments of error for our review:

**1.    The trial court prejudicially erred and abused its discretion in overruling appellant's motion to suppress because the arresting**

**officer lacked a reasonable articulable suspicion to seize appellant, unreasonably prolonged the subsequent investigative detention and arrested appellant without probable cause thereby depriving appellant of his guaranteed rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the Ohio Constitution.**

**2.     The trial court prejudicially erred and abused its discretion in granting the State leave to enter a nolle prosequi on the first day of a jury trial in order to thwart appellant's use of what otherwise was relevant and potentially exculpatory evidence and prevent him from presenting a complete defense and thereby deprived him of his guaranteed rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.**

**3.     The trial court committed prejudicial error and plain error in sua sponte giving an ad-lib supplemental jury instruction that substantially deviated from the traditional "*Howard* Charge" and did not inform the jury that if it remained deadlocked it could be released without reaching a unanimous verdict.**

### III.  Discussion

**A. First Assignment of Error:  Did the trial court err by denying Ramos's motion to suppress evidence?**

{¶14} In his first assignment of error, Ramos argues that the trial court erred by denying his motion to suppress evidence.

**i. Standard of Review**

{¶15} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.  At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id.  See*

*State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997). Because the facts of this case, as recited above, are not in dispute, we are concerned only with whether these facts satisfy the applicable legal standards. *See State v. Wagner*, 3d Dist. Logan No. 8-20-06, 2020-Ohio-5574, ¶ 11.

**ii. The trial court did not err by denying Ramos's motion to suppress evidence.**

{¶16} Ramos argues the trial court erred in three respects when it denied his motion to suppress evidence. First, Ramos contends that his encounter with Trooper Dyer was illegal at its inception because the encounter was not consensual. Second, Ramos maintains that even if the encounter was constitutional when initiated, it ripened into an unconstitutional detention because Trooper Dyer did not have reasonable suspicion sufficient to prolong the encounter and expand his investigation. Finally, Ramos argues that Trooper Dyer did not have probable cause to arrest him for OVI.

**a. Even if the encounter between Ramos and Trooper Dyer was not consensual, Trooper Dyer had reasonable suspicion to stop Ramos.**

{¶17} At the suppression hearing, Trooper Dyer testified that when he pulled behind Ramos's vehicle and activated his overhead lights, several concerns were at the front of his mind:

> At that time I pulled behind him, because I didn't know if he was having some kind of mechanical problem, [or] if he was just tired. But we have to follow through with reckless driving complaints. So at that point, I was treating it as a disabled vehicle on the ramp, and see[ing] if there was anything wrong inside the vehicle, medical-wise, [or] if he was sleepy, or if he was, in fact, impaired.

(Jan. 30, 2020 Tr. at 10). In concluding that the encounter between Ramos and Trooper Dyer was constitutionally permissible from the outset, the trial court did not focus on Trooper Dyer's suspicions regarding Ramos's possible impairment. Instead, the trial court concentrated on the fact that Ramos was already pulling off to the side of the entrance ramp when Trooper Dyer activated his overhead lights, as well as Trooper Dyer's safety-related concerns. In its entry denying the suppression motion, the trial court stated:

> Here, the evidence that was presented shows that the initial stop by [Ramos's] vehicle was voluntary. He was not pulled over by [Trooper Dyer]. At that point, the officer was unsure of [Ramos's] situation, whether he needed help or some assistance. Thus, the initial stop and approach by [Trooper Dyer] was consensual.

{¶18} Ramos disputes the trial court's conclusion, noting that Trooper Dyer testified that once he activated his overhead lights, Ramos was not free to leave until

he was assured that Ramos "was not going to be a danger to himself or others as he continued down the roadway." Ramos submits that because Trooper Dyer "used that show of authority," the encounter was not consensual and was instead "akin to a traditional traffic stop requiring the driver to remain stopped and not drive away." However, the distinction raised by Ramos is irrelevant. Even if we were to conclude that the encounter was not consensual,[1] the record establishes that Trooper Dyer had reasonable suspicion to seize Ramos in order to address his safety-related concerns.

{¶19} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 7. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769 (1996). Consequently, "[a]n automobile stop is * * * subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810. To effect a constitutionally reasonable traffic stop, a law enforcement officer usually must have at least "'a reasonable and articulable suspicion that a motorist has committed, is

---

[1] In addressing Ramos's argument as we do, we do not need to make a determination whether the encounter was consensual. That said, however, there is case law supporting that encounters similar to the one between Ramos and Trooper Dyer are consensual. *See State v. Percy*, 7th Dist. Mahoning No. 04 MA 265, 2006-Ohio-1285.

committing, or is about to commit a crime,' including a traffic violation." *State v. Moiduddin*, 3d Dist. Union No. 14-18-15, 2019-Ohio-3544, ¶ 11, quoting *Mays* at ¶ 7.

{¶20} However, although many traffic-stop cases "stand for the proposition that a police officer generally needs a reasonable suspicion, based on specific and articulable facts, that an occupant of a vehicle is or has been engaged in *criminal* activity, nothing in the Fourth Amendment requires that the 'specific and articulable facts' relate to suspected criminal activity." (Emphasis sic.) *State v. Norman*, 136 Ohio App.3d 46, 53 (3d Dist.1999). "[T]o insist that every vehicle stop be supported by a reasonable, articulable suspicion of criminal activity would be to 'overlook[] the police officer's legitimate role as a public servant designed to assist those in distress and to maintain and foster public safety.'" *Moiduddin* at ¶ 36, quoting *Norman* at 53. Thus, in some circumstances, an officer may lawfully stop a vehicle solely to check on the welfare of the vehicle's occupants or to address other matters imperiling public safety. As with all seizures by law enforcement officers, the touchstone of a permissible safety-related stop is reasonableness. *Id.*, quoting *Norman* at 54. "Provided that a law enforcement officer is 'able to point to reasonable, articulable facts upon which to base her safety concerns,' the brief seizure of an automobile and its occupants will be deemed reasonable." *Id.*, quoting *Norman* at 54.

-12-

{¶21} Regardless whether a traffic stop is actuated by a law enforcement officer's safety-related concerns or their suspicions of criminal activity, the test of reasonable suspicion is the same. "The level of suspicion required to meet the reasonable-suspicion standard 'is obviously less demanding than that for probable cause' and 'is considerably less than proof * * * by a preponderance of the evidence' but is 'something more than an "inchoate and unparticularized suspicion or 'hunch.'"'" *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, ¶ 20, quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989), quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868 (1968). To justify a seizure on the basis of reasonable suspicion, the law enforcement officer involved "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Bobo*, 37 Ohio St.3d 177, 178 (1988), quoting *Terry* at 21.

{¶22} In assessing whether a seizure was supported by reasonable suspicion, "the 'totality of circumstances' must be considered and 'viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.'" *Hawkins* at ¶ 21, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United*

*States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744 (2002), quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690 (1981).

{¶23} In this case, when Trooper Dyer pulled behind Ramos's vehicle and activated his overhead lights, he was aware (1) that it was after 3:00 a.m.; (2) that the Ohio State Highway Patrol had received a call reporting a recklessly-driven vehicle traveling north on U.S. 23; (3) that a vehicle matching the one described by the caller was in fact traveling north on U.S. 23; (4) that the vehicle was traveling 15 miles per hour under the posted speed; (5) that the vehicle exited U.S. 23 and almost immediately turned as though to reenter U.S. 23 heading south; and (6) that the vehicle pulled off to the side of the entrance ramp and was coming to a stop. We conclude that, considering this collection of facts, Trooper Dyer had a reasonable, articulable suspicion that Ramos may have been in need of some sort of assistance and that Trooper Dyer was thus justified in briefly seizing Ramos to confirm or dispel this suspicion.

{¶24} To begin, the call reporting that Ramos had repeatedly been "unable to maintain a lane for an extended period of time" lends some support for Trooper Dyer's concerns that Ramos was perhaps extremely fatigued or dealing with a malfunctioning vehicle. *See Cleveland v. Martin*, 8th Dist. Cuyahoga No. 105420, 2018-Ohio-740, ¶ 10 ("[A]n officer has a duty to investigate erratic driving in order to protect the public, and the driver himself, from driving * * * while mentally

fatigued, or even from driving with some mechanical defect of the vehicle."); *State v. Andrews*, 3d Dist. Auglaize No. 2-07-30, 2008-Ohio-625, ¶ 13 (finding reasonable suspicion for an investigatory stop based on a driver's erratic weaving within his own lane at around 3:00 a.m., as such driving could "easily evidence a fatigued driver" who presented "dangers to themselves and other drivers").

{¶25} Moreover, Trooper Dyer's observations, specifically that Ramos was driving at a relatively slow speed and that Ramos had turned to reenter the highway, added to the suspicion generated by the caller's report insofar as these observations further suggested that Ramos might have been fatigued, confused, or driving a malfunctioning vehicle. *See Moiduddin*, 2019-Ohio-3544, at ¶ 37 (concluding that, in some circumstances, a law enforcement officer may be justified in stopping an "abnormally slow-moving vehicle" to determine, among other things, "whether the vehicle is suffering from a mechanical malfunction"); *United States v. Phillips*, 1 Fed.Appx. 847, 849 (10th Cir.2001) ("[W]e cannot say that the trial court erred in concluding that twice crossing the line plus the vehicle's exceptionally slow speed justified the officer's suspicion that the driver was * * * fatigued * * *."). And when Ramos pulled off to the side of the entrance ramp, Trooper Dyer had additional reason to believe that his intervention was necessary for Ramos's safety and for the safety of the general public. *See State v. Chrzanowski*, 180 Ohio App.3d 324, 2008-Ohio-6993, ¶ 28 (11th Dist.) (concluding that where a vehicle was stopped partially

in the roadway with its headlights on, trooper would have had the right to stop the driver to address public-safety concerns and investigate the possibility that the vehicle was having mechanical problems or that the driver was experiencing a medical condition); *Norman*, 136 Ohio App.3d at 55 (where trooper observed a vehicle, running and with its lights on, parked at an intersection for two minutes at 2:43 a.m., trooper had reasonable suspicion to stop the vehicle to investigate concerns about the condition of the vehicle, the safety of its occupants, and the safety of other motorists). Therefore, based on the facts known to Trooper Dyer at the time he activated his overhead lights, Trooper Dyer was warranted in temporarily seizing Ramos to address his safety-related concerns.

**b. Trooper Dyer had reasonable suspicion to detain Ramos to investigate whether Ramos had committed an OVI offense.**

{¶26} Ramos also argues that the trial court erred by concluding that Trooper Dyer had reasonable suspicion to expand the scope of the encounter to investigate whether he had committed an OVI offense. We disagree.

{¶27} When conducting a traffic stop, an officer "'may detain an automobile for a time sufficient to investigate the reasonable, articulable suspicion for which the vehicle was initially stopped.'" *State v. Troutman*, 3d Dist. Marion No. 9-11-17, 2012-Ohio-407, ¶ 22, quoting *State v. Smith*, 117 Ohio App.3d 278, 285 (1st Dist.1996). The stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct.

1319 (1983). Nevertheless, if, during the course of the traffic stop, the officer develops a reasonable suspicion that the occupants of the vehicle are engaged in criminal activity unrelated to the officer's original justification for the stop, the officer may expand the scope and duration of the stop as reasonably necessary to investigate his new suspicion. *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 15; *State v. Waldroup*, 100 Ohio App.3d 508, 513 (12th Dist.1995).

{¶28} Here, some of the factors that justified Trooper Dyer in seizing Ramos in the first place—the report that Ramos was driving recklessly, Ramos's slow driving—also served as potential signs of impairment. Erratic driving, like that described in the caller's report, can indicate intoxication. *See State v. Heiney*, 11th Dist. Portage No. 2006-P-0073, 2007-Ohio-1199, ¶ 23. Furthermore, Trooper Dyer testified that "traveling under the posted speed limit, more than 10 miles an hour, * * * is a sign of impaired driving." (Jan. 30, 2020 Tr. at 26). Courts have confirmed that slow speed is a relevant factor in the formation of reasonable suspicion. *See State v. Tidwell*, 165 Ohio St.3d 57, 2021-Ohio-2072, ¶ 46-47 (concluding that an officer had reasonable suspicion to briefly detain a suspected intoxicated motorist in part because the officer observed the motorist slowly back out of a parking space and approach a busy road at an "unusually slow speed"); *State v. Bacher*, 170 Ohio App.3d 457, 2007-Ohio-727, ¶ 12 (1st Dist.) ("[A]n officer's suspicion is reasonable when a driver is traveling well below the speed limit and is engaged in other unusual

-17-

driving behavior that would suggest intoxication * * *.").  Ramos's unusual course of travel—exiting and then apparently reentering U.S. 23 moments later—was also notable as it suggested the possibility that Ramos was disoriented.

{¶29} In addition, upon approaching Ramos's vehicle, Trooper Dyer immediately detected a number of additional potential indicators of impairment. While Trooper Dyer did not notice the smell of alcohol or drugs coming from Ramos or his vehicle, he saw that Ramos's eyes were bloodshot, that he was talkative, and that his movements were erratic and "herky-jerky."  In conjunction with everything else known to Trooper Dyer at the time, these observations warranted Trooper Dyer in expanding the scope of the encounter to investigate whether Ramos was driving under the influence of an intoxicant.  This is true even if there were some non-criminal explanation for Ramos's behavior, such as that he was tired after having been awake for 30 hours.  "'A determination that reasonable suspicion exists * * * need not rule out the possibility of innocent conduct.'"  *Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, at ¶ 22, quoting *Arvizu*, 534 U.S. at 277.

**c. Trooper Dyer had probable cause to arrest Ramos on suspicion of committing an OVI offense.**

{¶30} Lastly, Ramos argues that Trooper Dyer did not have probable cause to arrest him.  On this point, the trial court concluded that "[o]nce [Ramos] stepped out of the vehicle and attempted to perform the field sobriety tests, his performance on those tests established probable cause to arrest * * *."

{¶31} "A warrantless arrest in a public place based on probable cause does not violate the Fourth Amendment of the United States Constitution." *State v. Davis*, 3d Dist. Allen No. 1-08-62, 2009-Ohio-2527, ¶ 6. "In determining whether a police officer has probable cause to arrest a suspect for OVI, a court considers whether, at the moment of arrest, the officer had information within the officer's knowledge, or derived from a reasonably trustworthy source, of facts and circumstances sufficient to cause a prudent person to believe the suspect was driving under the influence of alcohol, drugs, or both." *State v. Montelauro*, 10th Dist. Franklin No. 11AP-413, 2011-Ohio-6568, ¶ 20. "'Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Columbus v. Weber*, 10th Dist. Franklin No. 06AP-845, 2007-Ohio-5446, ¶ 8, quoting *State v. Cabell*, 6th Dist. Lucas No. L-06-1026, 2006-Ohio-4914, ¶ 27. "In determining whether probable cause for an arrest existed, we must examine the totality of facts and circumstances surrounding the arrest." *Davis* at ¶ 6.

{¶32} Here, by the time Trooper Dyer placed Ramos under arrest, Trooper Dyer had witnessed Ramos's less-than-proficient performance on each of the field sobriety tests. Trooper Dyer was not certain what drug or combination of drugs Ramos might have consumed, but he suspected Ramos was under the influence of some type of stimulant. Indeed, Trooper Dyer later testified that the "field sobriety,

the balance tests were consistent with [his] experience with methamphetamine usage." (Jan. 30, 2020 Tr. at 24). Regardless, for Trooper Dyer to have probable cause to arrest Ramos, it was not necessary that Trooper Dyer identify with precision the substance ingested by Ramos. *State v. Cummins*, 12th Dist. Clermont No. CA2018-07-051, 2019-Ohio-1496, ¶ 38. It is enough that, at the moment of Ramos's arrest, Trooper Dyer had information sufficient to cause a prudent person to believe that Ramos was driving under the influence of drugs, whatever the exact identity of those drugs. *See id.* at ¶ 37 (concluding that there was probable cause to arrest where trooper witnessed improper driving, driver's eyes were red and droopy, and driver exhibited a number of clues when completing field sobriety tests). Therefore, we conclude that the trial court correctly determined that Trooper Dyer had probable cause to arrest Ramos.

{**¶33**} Ramos's first assignment of error is overruled.

**B. Second Assignment of Error: Did the trial court abuse its discretion by granting the State's request to dismiss the under-the-influence OVI charge?**

{**¶34**} In his second assignment of error, Ramos argues that the trial court abused its discretion by granting the State's motion to dismiss the under-the-influence OVI charge. Ramos claims that the State moved to dismiss the under-the-influence OVI charge only after "defense counsel advised the trial court that he intended to introduce the cruiser video that the parties stipulated into evidence at the suppression hearing." Ramos apparently intended to use the dashboard camera

-20-

video to show that the urinalysis results were unreliable because his behavior, as depicted in the video, was inconsistent with a person who had ingested amphetamine or methamphetamine. Ramos maintains that the State's sole purpose in moving to dismiss the under-the-influence OVI charge was to have this video, the "centerpiece" of his defense, excluded on relevancy grounds.

**i. Standard of Review & Applicable Law**

{¶35} "A trial court's decision to grant or deny a prosecutor's request to dismiss a charge is reviewed for an abuse of discretion." *State v. Daniels*, 1st Dist. Hamilton No. C-170145, 2018-Ohio-1701, ¶ 16. An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

{¶36} Crim.R. 48(A) provides that "[t]he state may by leave of court and in open court file an entry of dismissal of an indictment, information, or complaint and the prosecution shall thereupon terminate." Similarly, R.C. 2941.33 provides that "[t]he prosecuting attorney shall not enter a nolle prosequi in any cause without leave of the court, on good cause shown, in open court." "'These provisions are essentially identical * * *.'" *Lakewood v. Pfeifer*, 83 Ohio App.3d 47, 50 (8th Dist.1992), quoting *State v. Sutton*, 64 Ohio App.2d 105, 107 (9th Dist.1979); *see State v. McKinsey*, 3d Dist. Allen No. 1-77-37, 1977 WL 199299, *2 (Nov. 14,

1977) (indicating that the authority provided by Crim.R. 48(A) "is substantially equivalent to that formerly provided by R.C. 2941.33").

{¶37} "Where the state's motion for a nolle prosequi meets the good cause and open court requirements of Crim.R. 48(A), it should be granted." *State v. DaRe*, 7th Dist. Belmont No. 16 BE 0011, 2017-Ohio-7585, ¶ 14. "'Good cause,' which has been defined as 'a substantial reason and one that affords a legal excuse,' is a determination that can be made only on a case-by-case basis." *State ex rel. Steele v. McClelland*, 8th Dist. Cuyahoga No. 105893, 2017-Ohio-8233, ¶ 11, quoting *State v. Brown*, 38 Ohio St.3d 305, 308 (1988).

**ii. The trial court did not abuse its discretion by granting the State's request to dismiss the under-the-influence OVI charge.**

{¶38} On the morning of trial in this case, the parties met in chambers out of the presence of the prospective jury. There, the prosecutor reviewed the pending charges with the trial court, noting that there were three different OVI charges then pending against Ramos. (Aug. 19, 2020 Tr. at 5). The prosecutor then made "a motion to dismiss the [under-the-influence OVI] charge and proceed on the other two per se violations." (Aug. 19, 2020 Tr. at 5). Although the State's motion was made in chambers, rather than in the courtroom, "a hearing in chambers will * * * satisfy the open court requirement of both the rule and the statute * * *." *Sutton* at 107.

{¶39} After some discussion, the trial court granted the motion to dismiss. (Aug. 19, 2020 Tr. at 7). While the trial court did not explicitly find good cause for the dismissal, "[i]t is * * * permissible to infer from the fact that a nolle prosequi is entered by order of the court that the court has found good cause." *State v. Allen*, 6th Dist. Lucas No. L-97-1444, 1999 WL 146259, *5 (Mar. 19, 1999), citing *Douglas v. Allen*, 56 Ohio St. 156, 160-161 (1897). Indeed, the apparent basis for the State's motion to dismiss the under-the-influence OVI charge—the existence of the two pending per se OVIs—constituted good cause. *See State ex rel. Steele v. McClelland*, 154 Ohio St.3d 574, 2018-Ohio-4011, ¶ 6 ("[T]he existence of the second indictment * * *, which changed two counts contained in the first indictment from gross sexual imposition to rape, constituted 'good cause' for purposes of R.C. 2941.33."), citing *State v. McWilliams*, 8th Dist. Cuyahoga No. 68571, 1995 WL 386981, *3 (June 29, 1995).

{¶40} Although the dismissal of the under-the-influence OVI charge ultimately led to the exclusion of the dashboard camera video, the record does not establish that this was the end the State sought to achieve by moving for the dismissal. Furthermore, even if this were the State's objective, there is nothing to show that the State's motives were malicious or corrupt. The State could well have had a desire to simplify the matter for the jury and preempt the possibility that the jury would confuse the issue of Ramos's prohibited urine-amphetamine and urine-

methamphetamine concentrations with the issue of his impairment. Accordingly, we conclude that the trial court did not abuse its discretion by granting the State's motion to dismiss the under-the-influence OVI charge.[2]

{¶41} Ramos's second assignment of error is overruled.

## C. Third Assignment of Error: Did the trial court err by issuing the supplemental jury instruction?

{¶42} In his third assignment of error, Ramos argues that the trial court erred by issuing the supplemental jury instruction after the jury had retired to deliberate. Ramos contends that "the jury became deadlocked just thirty minutes into their deliberations" and that, as a result, the trial court should have provided the jury with the supplemental instruction approved by the Supreme Court of Ohio in *State v. Howard*, 42 Ohio St.3d 18 (1989). Ramos argues that the "ad-lib supplemental instruction" issued by the trial court "so deviated from the long established and approved" *Howard* charge that it "constituted both prejudicial and plain error necessitating reversal and remand for a new trial."

---

[2] Under his second assignment of error, Ramos also suggests that the trial court erred by excluding the dashboard camera video from trial. However, given the summary nature of this argument and the fact that Ramos's appellate brief contains no legal citations to support it, we need not consider it. This notwithstanding, we note that "[a] defendant's 'appearance, manner of speech and walking, and lack of any symptoms of intoxication are not relevant evidence and, therefore, not admissible' in an OVI per se trial." *State v. Casner*, 10th Dist. Franklin No. 10AP-489, 2011-Ohio-1190, ¶ 17, quoting *State v. Boyd*, 18 Ohio St.3d 30, 31 (1985).

**i. Standard of Review**

{**¶43**} "Jury instructions are within the trial court's discretion." *State v. Lightner*, 3d Dist. Hardin No. 6-09-02, 2009-Ohio-4443, ¶ 11. Generally, absent an abuse of that discretion, we will not reverse a trial court's decision whether to give a particular jury instruction. *Id.* However, where, as in this case, "there was no formal objection and the record does not reveal a material dispute over the jury instructions, appellate review must be limited to plain error under Crim.R. 52(B)." *State v. Kiehl*, 11th Dist. Portage No. 2015-P-0020, 2016-Ohio-8543, ¶ 25. "An improper or erroneous jury instruction does not constitute plain error under Crim.R. 52(B) unless, but for the error, the outcome of the trial would clearly have been different." *State v. Davis*, 8th Dist. Cuyahoga No. 109890, 2021-Ohio-2311, ¶ 30, citing *State v. Cooperrider*, 4 Ohio St.3d 226, 227 (1983).

**ii. The trial court did not commit plain error when it issued the supplemental jury instruction.**

{**¶44**} The events that resulted in the trial court issuing the supplemental jury instruction are peculiar, though somewhat unclear. The trial transcript reflects that the jury began deliberating at 3:48 p.m. After approximately 40 minutes of deliberations, the trial court brought the jury back into the courtroom "[a]fter hearing loud yelling coming from the deliberations, and indications from the jury of discourse [sic]." (Aug. 19, 2020 Tr. at 235). The trial court then advised the jury as follows:

Thank you. Please be seated. It's my understanding that there was an issue here while the jury was deliberating, and it's an unusual issue. It's not something that I've ever encountered before. All I can do is ask you eight individuals to take into consideration that you all come from different points in life, you all come from different perspectives. But the good thing about it is that that's what makes the system work. And that's why we ask that you work together, rationally discuss the issues, give everybody a chance to give their perspectives, listen as others give their perspectives, and work on making a decision.

This is an emotional issue. People are passionate about certain things. We understand that. And we ask that you work together and come up with a verdict. Thank you.

(Aug. 19, 2020 Tr. at 235-236). Deliberations recommenced at 4:28 p.m., and at 4:58 p.m., the jury indicated that it had reached a verdict. (Aug. 19, 2020 Tr. at 236).

{¶45} After reviewing the record, we cannot conclude that the trial court's supplemental jury instruction constitutes plain error. Although Ramos faults the trial court for deviating from the language approved in *Howard*, the record does not support that the trial court was even required to give a *Howard* charge. "The instruction formulated by *State v. Howard* is to be given to a jury when it has been determined that the jury is deadlocked in its decision." *State v. Thomas*, 3d Dist. Allen Nos. 1-11-25 and 1-11-26, 2012-Ohio-5577, ¶ 53. Here, however, there is no indication that the trial court was ever informed that the jury was unable to reach a verdict or that it was having difficulty doing so. Although the record does not disclose the precise nature of the disturbance that necessitated the supplemental

instruction, there is nothing to suggest that it stemmed from the jury's inability, after only 40 minutes of deliberations, to reach a verdict. In the absence of any clear signal that the jury was in fact deadlocked, it does not appear that a *Howard* charge was necessary. *See Toledo v. Powell*, 6th Dist. Lucas No. L-13-1123, 2014-Ohio-3627, ¶ 16. Whatever disturbance may arise in the jury room, the trial court is afforded latitude in how to address the matter and discretion in any additional instructions the court determines necessary to provide.

{¶46} In addition, much of the information contained in the trial court's supplemental instruction had already been conveyed to the jury, at least in substance. In the "Final Instructions" read to the jury before they retired for deliberations, the trial court informed the jury that it had to select a foreperson and that the foreperson "serves the purpose of helping to conduct your deliberations in an orderly manner and to give each of you the opportunity to express your opinion." The trial court further instructed the jury that it was its duty to "arrive at a just verdict" after "carefully weigh[ing] the evidence." Moreover, jurors were advised to "[c]onsult with one another in the jury room and deliberate with a view to reaching an agreement if you can do so without disturbing your individual judgment." Finally, the jurors were instructed that they were required to decide the case for themselves, but "only after a discussion of the case with the other jurors." Thus, the trial court's supplemental instruction largely repeated information

previously communicated to the jury, and it did so in a balanced, neutral fashion. As we can find nothing improper in the trial court's supplemental jury instruction, we conclude that the trial court did not commit plain error when it issued it.

**{¶47}** Ramos's third assignment of error is overruled.

## IV. Conclusion

**{¶48}** For the foregoing reasons, Ramos's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Marion Municipal Court.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**